# CHARLESTON.

JAMES BRYAN *v.* FAIRFAX FOREST MINING & MFG. CO.

Submitted October 11, 1921.   Decided October 25, 1921.

1.   EQUITY—*May Extend Time of Performing Contract, Where Other Party Delays Performance.*

It is within the power of a court of equity to extend the time for the performance of a contract, where either party unduly obstructs or delays the other in its performance.   (p. 321).

2.   SAME—*Party Seeking Extension for Other Party's Obstruction or Delay Must Show Diligence and Sufficient Cause.*

To authorize such extension the party so obstructed or delayed must have been diligent in performing the contract

within the time stipulated therein for its performance, and must also show sufficient cause for the extension sought by him.   (p. 319).

3.   SAME—*Party Seeking Extension Has· Burden of Showing Cause Therefor.*

Upon him who asserts the right to such an extension rests the burden of showing cause therefor.   (p. 319).

4.   SAME—*Where There Were Two Agreed Extensions, Party Seeking Further Extension for Other Party's Obstruction or Delay Should Show Ample and Satisfactory Proof.*

Where the contract whose extension is sought was to be performed within five years from its date, but not being so performed within that time the party not at fault voluntarily granted two years additional time for its performance, and subsequently by a written agreement granted another like period upon a cash consideration, or a total time limit of nine years, the proof should be ample and satisfactory in order to warrant still further indulgence.   (p. 316).

5.   SAME—*Idle Rumors of Delayed Party's Financial Inability, in Absence of Proof Thereof, Held Insufficient in Suit for Extension of Time.*

Mere idle rumors of the financial inability of the party delayed to pay, and his tardiness in payment of wages earned by his employees is not substantial cause for such extension, in the absence of proof of his dereliction in that respect.   (p. 318).

6.   SAME—*Circulation of Rumors by Party's Agent as to Other Party's Inability to Pay Employees Held Insufficient to Warrant Extension of Time for Performing Contract.*

The circulation of such rumors by an agent of a corporation, when not engaged in the course of his employment as custodian of its property, and without its authorization, knowledge or consent, and which, when informed of such circulation, directs him to desist therefrom, and he does desist, is not sufficient to warrant the extension.   (p. 318).

7.   CORPORATION—*Acts of Agent in Charge of Corporation's Property Do Not· Affect Right of Owners of its Stock.*

The acts and conduct of a corporation's agent, a custodian of its property, whose duty it is to protect the property from trespassers and to collect rents from its tenants, do not affect the right of the owners of the corporation's capital stock, as its agent is not their agent, and his acts are not theirs, un-

less they authorized or ratified such acts and conduct on his part. (p. 319).

(MILLER, JUDGE, Absent).

Appeal from Circuit Court, Grant County.

Bill by Jonathan Bryan against the Fairfax Forest Mining & Manufacturing Company and others, for enforcement of liens created by decrees in a former suit. From a decree for plaintiff, defendant William C. Bond appeals.

*Affirmed.*

*C. O. Strieby,* for appellant.

*L. J. Forman, Charles McH. Howard* and *John B. Deming,* for appellees.

LYNCH, JUDGE:

The bill and amended bill, though called petitions, had for their object enforcement of liens created by decrees in a former suit in favor of plaintiff's intestate and some of the defendants against the real estate of Fairfax Forest Mining & Manufacturing Company, a corporation, consisting of 2309 acres. The decree entered in this cause after the report of the commissioner, to whom it was referred, was filed and confirmed, established and coordinated the former decrees as such liens, adjudicated the rights claimed by Davis Coal & Coke Company under coal mining leases covering parts of the land, and the claim of Theodore G. Lurman for commissions for services rendered by him in procuring the leasehold contracts, and directed a sale of the land to satisfy the liens thus ascertained and determined; but denied William C. Bond, the purchaser of the timber on the land, a further extension of the right to remove it beyond the five year period provided in the original contract, dated April 17, 1911, and two extensions of the time limit, one oral, the other written, the last postponing the date to April 17, 1920. The written extension agreement bears date, November 27, 1917. The whole contract period, therefore, was nine years, or from April 17, 1911 to April 17, 1920.

The timber contract was a cash transaction and Bond en-

89 W. Va.

tered upon the tract, installed all the equipment by him deemed necessary or sufficient to manufacture the timber into lumber and market the product, and to exercise the rights and privileges accorded to him by the contract, but did not succeed in the accomplishment of the purpose of the grant within the original five year period, or the period covered by the oral and written extension agreements, the latter expiring ten days before the institution of this suit, April 27, 1920. In his answer, also called a petition, to the bill, Bond claims the right to a further enlargement of the time to complete the timber removal and lumber operations on the land, and assigns as reasons for this enlarged opportunity the interference by J. E. Grimes, agent of defendant, Fairfax Forest Mining & Manufacturing Company, alleging that but for such interference, he would have succeeded in completing the contract within the time so prescribed.

The so called interference consisted in the use by Grimes on various occasions in the presence of Bond's employees of language reflecting upon the financial ability and integrity of Bond, and his disposition to delay payment of his contract obligations, until such payment was compelled by legal proceedings, the ultimate effect of which derogatory remarks and aspersions was to create, and he contends did create, doubt in the minds of the employees as to the receipt of their wages when due; also by way of other alleged acts and conduct of Grimes creative of dissatisfaction among the employees relative to the collection of rents from such of them as occupied some of the houses on the land. These rents, however, Grimes apparently had authority to collect and did collect, pursuant to such authority, before the date of the last extension agreement, as other agreements are silent as to the right of Bond to the use of the houses, the contract of November 27, 1917, having for the first time conferred upon him the right to use the houses rent free, except the one occupied by Grimes; and although he continued to exact and collect rents thereafter due and payable, he did so without knowledge of the contract terms, and when advised by Howard of the terms he ceased to require and collect rents from the occupants. He may have been, and

perhaps was, indiscreet in dealing with the occupants, as he seems to have been somewhat irascible and petulant, and apparently there was enmity or lack of cordiality between him and Bond.

Because of such remarks and the creation of such doubt, and the acts and conduct relative to rents, Bond's contention is that he lost the services of men employed by him, and for that reason was unable to cut and manufacture the timber into lumber when and as so required, but could do so within three or four months, if the time was extended that long, and Grimes compelled to cease interference with his working force.

Grimes defines his relation to the Fairfax Forest Mining & Manufacturing Company as ''Custodian of the property with authority to rent and collect rents and to protect the property.'' He did negotiate the sale of the timber to Bond, subject, however, to the company's approval, received, but did not collect Bond's check, delivered to him as payment for the lumber contract. He took it to the bank on which it was drawn, requested the cashier to certify it, and when certified, transmitted it to William Bowly Wilson, a resident of Baltimore, and then president and owner of a large part of the capital stock of Fairfax Forest Mining & Manufacturing Company, but now deceased, Charles McH. Howard having succeeded him in that capacity since his death.

There was doubt whether, because of his delay in the timber operation on the land, whatever the cause may have been, Bond would be able to secure the extension of the time of performance, finally granted, and Grimes so informed Pace and ''a gentleman'' with him who contemplated an agreement to cut the timber and stock the mill, but did not secure the agreement, perhaps, but not certainly, because of such doubt. Grimes at that time believed the extension improbable, although without his knowledge negotiations therefor were then pending, perhaps consummated.

Grimes does not deny, but admits making the remarks, proved by other witnesses, and as charged in Bond's answer, but what he said, he contends, was a matter of common knowledge in the community; and as to the generality of the

rumor, several of Bond's employees corroborated him, and they heard it mentioned and discussed when assembled at the railroad station and elsewhere, when Grimes may or may not have been present, or, if he was, they were not aware of his presence, as they were not acquainted with him at that time.

But conceding, as we must concede, as the proof sufficiently shows that Grimes, both before and since the last extension, did discuss Bond's dereliction in the payment of wages earned by his men, and that a few of them did cease to labor for him on account of the impression thus created, still no proof shows failure on the part of any of them to receive wages earned by them, when due and payable, though some did quit the employment in part because of the derogatory remarks heard by them, and for other reasons.

An active business man, as Bond has shown himself to be, is to be judged by his acts, rather than by idle reports of his want of financial integrity, and it is hardly conceivable that his lumber operations were delayed because of such reports. Other reasons must have been responsible for the delay. He had nine years to manufacture the timber, and he had cause to suspect that he could not obtain further indulgence in that behalf, and even if now, as noted, he deems three or four months ample time to complete the contract, the lower court evidently concluded that he was not entitled to that relief.

But Grimes was not the agent of the lien creditors. Whatever authority he had, he did not derive it from them, and although the company of which they were stockholders may have been cognizant of the unfavorable comments, there is no proof that it authorized, ratified or condoned them. On the contrary, whenever informed of their utterance and of the attempted molestation of the right of the occupants of the dwellings to occupy and use them rent free, or of the wrongful creation of dissatisfaction among the employees, the officers of the company, notably Howard, admonished him to desist, and he did desist, at least insofar as the quiet use and enjoyment of the houses were concerned. But the evidence does not trace such knowledge home to the lien

creditors. That they, or some of them, were and yet are owners of the company's capital stock does not necessarily imply notice to them. But if they had such knowledge, yet if Grimes' acts and conversation were not authorized by them or by the company, and if such obnoxious treatment was not within the scope of the agency, neither was responsible for what Grimes said or did, except as to the right to collect rent for the houses, and his acts and conduct would not affect the stockholders, who did not directly or impliedly authorize or ratify them. His agency was not general, but limited, that of a custodian, whose principal duty was to protect the property in his care against unauthorized invasion. It did not confer the right to slander, and the company's officers sought to suppress that, when informed of it. Replying, April 2, 1918, to a letter of Mr. Strieby, Bond's counsel, dated March 30, referring to annoyance by Grimes, as reported to him by Bond, Mr. Howard told Grimes not to obstruct in any way Mr. Bond's use of the property, and for the first time notified him of the extension of the contract to April 17, 1920, he having theretofore inadvertantly omitted to impart to him that information. Instead of authorizing such conduct or treating it as within the actual or implied scope of the agency, the principal repudiated it.

The act of a servant may, it is true, be within the scope of the employment, if the act done is necessary to accomplish the purpose of the employment, and the servant so intends, even if in doing the act he exceeds the power conferred upon him by the master. The master or principal may also be civilly liable for the slander or libel published or circulated by his servant or employee, provided he is at the time acting within the scope of the employment. The purpose contemplated by the act done or the slander circulated, rather than the method of doing it, is the test whether it is within the scope of the employment. 26 Cyc. 1533-34; 2 C. J. 848-49; 25 Cyc. 427; 2 Mechem, Agency, Secs. 1926, 1957, 1981. There is in the evidence nothing even tending to show that while Grimes was uttering the terms of reproach or slanderous words, he was engaged in the active service of his principal, Fairfax Forest Mining & Manufacturing Company,

although it was during the agency. Generally, if not exclusively, the conversations, in which the words were used, occurred at the railway station where the laborers were awaiting the arrival of trains to carry them home, or on their way to resume work upon the property. At no time does it appear that Grimes was doing anything for the company at the time, or was advancing the interests of his employer in any way, or for any purpose connected with the duties assigned to him, or that what he did or said was beneficial to the company or in the furtherance of its corporate affairs. His conversation with Pace and his companion was as to the improbability of an extension of the lumber contract. That was at his house during the noon hour, probably during the noon meal in which the three participated.

Courts of equity can and will, when the facts and circumstances of a case warrant it, grant relief by an extension of a contract. But there are present in this case no facts and no circumstances justifying such an extension. Such relief has been granted in oil and gas litigation, where the lessor by his conduct and acceptance of benefits induces "the lessee or operator to believe that he will not insist upon the production of oil in paying quantities" within the time specified in the lease. *Ohio Fuel Oil Co.* v. *Greenleaf,* 84 W. Va. 67, cases cited.

Our conclusion, therefore, is to affirm the decree, and remand the cause.

*Affirmed.*