# CHARLESTON.

Elizabeth O. McCutcheon *et als. v.* Enon Oil & Gas Company

(No. 5568)

Submitted October 6, 1926.   Decided October 12, 1926.

1. Mines and Minerals—*Abandonment of Gas Lease on Land on Which Valuable Well Has Been Drilled Must be Shown in Express Terms, or Implied from Acts of Lessee Clearly Evincing Intention to Abandon, Coupled With Actual Relinquishment.*

Abandonment of a gas lease on land on which a valuable well has been drilled under the terms of the lease, must be shown in express terms, or implied from the acts of the lessee clearly evincing an intention to abandon, coupled with an

actual relinquishment of the leased lands.    (*Urpman* v. *Low-ther Oil Co.*, 53 W. Va. 501).    (p. 350.)

(Mines and Minerals, 40 C. J. § 723.)

2.  SAME—*If, Under Oil and Gas Lease Giving Right to Operate as Long as Oil or Gas Was Produced, Gas Well Was Drilled Producing 1,500,000 Feet Per Day, Within Time Stipulated, Right to Produce Becomes Vested.*

If, under an oil and gas lease giving the lessee the right to operate as long as "oil or gas or either of them is produced from the land," a gas well is drilled in by the lessee, producing one and one-half million feet per day, within the time stipulated for the completion of a well, then the right to produce becomes vested under the terms of the lease.   (p. 351.)

(Mines and Minerals, 40 C. J. § 670.)

3.  SAME—*Where Gas in Large Quantities is Found, 10-year Lease, Providing for Continuance as Long as Gas Was Produced, Was Not Automatically Terminated at End of 10 Years, Where Gas Had Been Shut in for Want of Market, and Lessee Partly Paid Quarterly Payments on Well and Offered to Pay Remainder, in Answer to Bill to Cancel Lease.*

Where gas in large quantity is found under a lease for ten years, within the term, which lease provides that it shall continue thereafter as long as gas is produced from the land, the lease is not automatically terminated at the end of the ten years, where the gas has been shut in by the lessee for want of a market, and he has partly paid the quarterly payments on the well and offers to pay the remainder, when ascertained, in his answer to a bill to cancel the lease as a cloud on lessor's title, on the ground that the lease has expired.   (p. 351.)

(Mines and Minerals, 40 C. J. § 696.)

(NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of Syllabi.)

Appeal from Circuit Court, Nicholas County.

Suit by Elizabeth O. McCutcheon and others against the Enon Oil & Gas Company to cancel an oil and gas lease.  From a decree for plaintiffs, defendant appeals.

*Reversed and remanded.*

*W. G. Brown* and *Koontz, Hurlbutt & Revercomb* for appellant.

*Charles A. Kreps, A. L. Craig* and *A. N. Breckenridge* for appellees.

Lively, Judge:

In 1911, Allen Rader executed an oil and gas lease to appellant Enon Oil & Gas Company on 500 acres of land in Nicholas County. Previous thereto he had conveyed about 200 acres of the land described in the lease to two of his sons, A. F. Rader and B. F. Rader, in fee. In Nov. 1919, Allen Rader conveyed the remaining 300 of the 500 acres to plaintiffs Elizabeth O. McCutcheon and Anna R. Bryant, who in Oct. 1924 (after the death of Allen Rader in 1922) leased the 300 acres to A. L. Craig who, later, in Nov. 1924, transferred his lease to the Carter Oil Company, also plaintiffs herein. In the following January these above named plaintiffs filed their bill against Enon Oil & Gas Company praying that its lease executed in 1911 by Allen Rader be declared forfeited, be declared expired and abandoned and null and void; and further prayed that it be cancelled and removed as a cloud on plaintiffs' title. Plaintiffs proceeded on the theory: (1) that defendant's lease had expired; (2) that it had been abandoned; and (3) that the lease had been forfeited. Defendant demurred, and answered denying many of the allegations of the bill, especially denying forfeiture, abandonment and expiration; admitted that Craig had obtained a lease and had transferred it to the Carter Oil Company, but charged that it was invalid; and prayed that it be cancelled and removed as a cloud on defendant's title to the oil and gas, The answer is in the nature of a cross-bill. The parties went to proof, and on Sept. 2, 1925, the decree complained of was pronounced wherein the court found that the rights of defendant under its lease from Allen Rader were ended before the institution of this suit, and that it had no right, title or interest in the lands, the same having ceased before the suit was instituted, and decreed cancellation thereof as a cloud on plaintiff's title.

Defendant's lease, which is the usual oil and gas lease. is for ten years and as long thereafter as oil or gas, or either of them, is produced. If gas was found lessee was to pay $75.00 quarterly for each well from which gas was marketed

and used off the premises. The lessee covenanted to complete a well on the land within a year or pay $131.25 quarterly after the one year as delay rental. When a well was completed the delay rental payments stopped, under the terms of the lease. The lessor was granted the right to take gas without charge from any well for use in one dwelling-house on the land. There was no forfeiture or re-entry clause. The lessee could surrender at any time upon "payment of ............." to the lessor, after which the lease became null and void.

Defendant company was chartered July, 1911, with an authorized capital stock of $25,000.00. A. Rader was one of the incorporators. It was duly organized, a board of directors elected, and Allen Rader was selected by the board as president, Dave McClung, vice-president, John S. Rader, secretary, and J. F. Sebert, treasurer.

On Aug. 28, 1911, Allen Rader executed the lease to defendant. A contract seems to have been entered into with a driller on July 15, 1911, for drilling a well, and was executed by "A. Rader, President". The well came in with a capacity of 1,500,000 feet of gas, and was accepted from the driller Sept. 15, 1911. Another well was sunk in December and produced gas, the capacity not stated, but in attempting to drill it deeper into the gas strata some mishap occurred, and the well was shut in. The gas from the first well was never marketed, for there was no market for it, except by piping it a great distance, the cost of which would have been prohibitive. Allen Rader, however, ran a pipe from the well and used gas for domestic purposes in two dwelling-houses on the land. These two wells, together with the expense in conducting the affairs of the corporation, involved an expenditure of about $11,000.00.

In 1912, the company employed L. V. Koontz as general manager. While other leases were contemplated and negotiations had with that view, it appears that no other leases were taken, and this lease is the only tangible asset.

In 1917, a stockholder's meeting was had at which Allen Rader was paid $1,000.00 in stock issued and delivered to him in settlement of the sums due him as lessor, and it appears

that the extra gas used at one of the houses was taken into account in the settlement. At that time an option was given to Koontz, who had become a stockholder, on the property with a view of marketing the gas at Summersville, four or six miles distant. The stockholders, who were farmers in the county, were to include in the transfer of the Allen Rader lease, leases on their respective lands at a stipulated delay rental per acre. For some reason this option was not made effective, and later, in 1922, the company voted to return to Koontz the sum of $1,000.00 which had been put up by him under the option.

After 1917 no further meeting of the stockholders was had until 1922, when one was called by Allen Rader and others holding more than 10% of the stock. There was present in person and by proxy, 419 shares of stock out of a total of 517 shares issued. Rader read a notice in writing to the meeting, in which he declared a forfeiture of the lease, and moved that an order be entered to execute to him a release. This motion was voted down by a large majority. Rader apparently accepted the result of the vote, and stated he was then depending on Koontz to get his (Rader's) money out of the venture. At this meeting a deposit of $1,000.00 which had been placed to the company's credit by Koontz under the option of 1917, was directed to be returned to him, as above stated. Rader was president of the company from its inception until his death on June 28, 1922. Since 1922 there has been nothing paid to the lessor or to his two daughters.

There is considerable controversy over the condition of the well. It appears that there is a leak in the casing and gas is now escaping, and that some water has found its way into the well and blows off when the well is blown. Appellees say this leakage is serious and will destroy the well. Witnesses for appellant say the leak is not serious and there is no danger to the well. The rock pressure was 175 pounds when the well came in; now it is 150 pounds, after many years flow to the two farm houses, the amount of which flow is not estimated. Graham, an expert with long experience, and uninterested in the suit, says that the condition of the well is not unusual,

and that the well has not been injured by the water. Rader, or some one for him, had erected a shed over the well, and there never had been any notice or information from him or any other person that the well was leaking or had water in it.

It appears that after the well was shut in it was not visited or inspected by any officer of the company, except Allen Rader, the president. His home was near the well, and no doubt the other stockholders and directors considered the well in safe hands. They had confidence in Rader or they would not have selected and continued him as the chief officer. Under such circumstances, the fact that the company as such did not visit the well for inspection, and that it began to leak and blow water without its knowledge, has little probative value of abandonment. The possession and use of the well by the president does not convert the use into an adverse holding, and prove abandonment on the part of his lessee. It is clearly shown that the venture was in "wildcat" territory. No gas had theretofore been produced in that neighborhood. There was no market for it if found. The meagre capital stock ($25,000.00) does not indicate an intention to construct pipe lines to a direct market. Rader was an incorporator, and his neighboring farmers were largely his associates. Could it be said under such circumstances that because the gas was shut in, the adventurers intended to abandon it, and the company to surrender the lease? On the contrary, there were efforts to organize a carbon black factory in which to use the gas, and there was the effort to market the gas through others, in Summersville, four or five miles away. There certainly was no abandonment up to 1917, when they paid Rader his rentals up to January 1, 1918. No inspection or visitation of the well had been made by the company as such, except by the president, up to that time, after the well had been shut in. The corporate existence and organization was kept intact. Its only asset, except unsold treasury stock, was this lease. Its failure to pay the rental does not work abandonment. To constitute abandonment the lessee must have the intention to abandon, and actually surrender.

*Urpman* v. *Lowther Oil Co.*, 53 W. Va. 501; Thornton on Oil & Gas (4th ed.) Sec. 155. The evidence and circumstances will not sustain the decree on the theory of abandonment. The burden of showing abandonment is upon plaintiffs, and they must show it by clear unequivocal evidence. The intention to abandon may be implied from the circumstances. *Harris* v. *Michael*, 70 W. Va. 356. But the implied intention must clearly appear. 1 C. J. page 7.

Can the decree be sustained on the theory that the lease was forfeited? A forfeiture in its broad meaning is the loss of an estate in consequence of the doing or omission of some act. *Pence* v. *Tidewater*, 127 Va. 447, 103 S. E. 694. There is no express clause of forfeiture for failure to develop, pay rental or for any other cause. When gas was produced from the land a vested estate accrued to the lessee. *McGraw* v. *Kennedy*, 65 W. Va. 595. The lease says that it shall remain in force for ten years, "and as long thereafter as oil or gas or either of them is produced from the said land." What acts or omissions are shown which will work a forfeiture of this vested title, which will impel a court of equity to declare forfeiture? Plaintiffs' claim of forfeiture is based on abandonment, failure to pay rental and failure to produce gas after the ten years in which the lease ran.

The claim of abandonment is without sufficient basis. The lease only required one well to be drilled. If there be an implied covenant to drill other wells promptly and develop the property, it is not sufficient to forfeit, for it cannot be said that such was the intention of the parties. There was no market for the gas, and to drill further wells without means of marketing the gas would have been poor business judgment. The capitalization of the defendant corporation would not permit the building of pipe lines to distant markets, or the creation of a market. It must be remembered that Rader, the lessor, was a stockholder and the president supervising its affairs and partially controlling its destinies. It is apparent that these farmers, some of whom say that Rader was one of the moving spirits in the venture, joined with him to find gas in "wildcat" territory thinking that the mere finding

of oil or gas in paying quantities would of itself create a
demand and market for it, and bring further development
to the community. Rader in a sense was dealing with him-
self by leasing to a corporate entity of which he was an
officer and director. Their efforts to market the gas seem
to have been sporadic and ineffectual. Rader himself was
the only person who derived any benefit from the well in
the use of gas. This is not a case where a lessor deals with
a stranger at arms length. Rader and his neighbors were
joint adventurers. Moreover, a breach of an implied cove-
nant in an oil and gas lease will not ordinarily work a for-
feiture. *Core* v. *Petroleum Co.,* 52 W. Va. 276; *Carbon Black
Co.* v. *Gillespie,* 87 W. Va. 441, 462.

It is argued that the failure to pay rental, taken in con-
nection with the alleged abandonment, works a forfeiture,
and the court should so hold. The failure to pay rentals
on the land or stipulated quarterly payments on the gas well
in lieu of land rentals, continued from 1911 to 1917, when
it is rather well established that Rader was paid up until
January 1, 1918, by the issuance and delivery to him of
stock. The same condition existed after that time as before,
except that there appears to have been an option given to
Koontz to take over the lease with other leases on the indi-
vidual lands of the stockholders, in order to justify reaching
a market through a stronger financial company. Then, in
1922, Rader called a meeting of the stockholders and read
a paper in which he declared a forfeiture of the lease and
moved that they enter an order surrendering it to him.
What cause was assigned in the notice for forfeiture does
not appear. By substantial majority they defeated his mo-
tion, and it appears that he acquiesced in the decision of his
co-adventurers. The failure to pay rentals on the well or
lands, under this state of facts, would be no cause for for-
feiture. This case is not like our recent case of *Martin* v.
*Consolidated Coal & Oil Corporation,* 101 W. Va. 721; 133
S. E. 626, and cases of that character, where an abandon-
ment was based on failure to develop, coupled with failure
to pay rentals. In that case the lessee never attempted to

sink a well or develop, and never paid delay rentals.  He had not obtained a vested estate in the minerals, as was done in this case.  The failure to make stipulated quarterly payments on the well is not ground for declaration of a forfeiture of the lease, in the absence of a clear and unequivocal stipulation that such failure to pay will forfeit.  We have many times declared, following the rule formulated when chancery courts came into existence, that equity will never lend its aid to enforce a forfeiture.  Never to declare or enforce a forfeiture, nor divest an estate or title for violation of a condition subsequent, is an invariable rule of equity, if there be a legal remedy.  Under such circumstances, a court of equity utterly declines to touch the case, and leaves the party to his legal remedies.  ''Equity abhors a forfeiture.''  *Craig* v. *Hukill*, 37 W. Va. 520; *Wheeling &c.* v. *Town of Triadelphia*, 58 W. Va. 487, 520; *Spies* v. *Railroad Co.*, 60 W. Va. 389; *Headley* v. *Hoopengarner*, 60 W. Va. 626, 646.  Plaintiffs had their legal remedy for the enforcement of the quarterly payments; and in the answer defendant proffers to pay, upon an ascertainment of the amount, claiming that plaintiffs should account for the gas used from the well in one of the houses which use was not authorized in the lease contract.  The lease cannot be forfeited because of non-payment of the quarterly payments, under the circumstances shown by the evidence.  In *Reserve Gas Co.*, v. *Carbon Black Manufacturing Co.*, 72 W. Va. 757, it is said: ''An oil and gas lease binding the lessee to drill a well on the leased premises within a certain period, or, in lieu thereof, make periodical payments or rental or delay money, and containing no clause of forfeiture, is not forfeitable merely by non-payment of the rental.  It can be terminated only by surrender, abandonment or expiration of the term.''

We can see very little strength in the claim that the lease has expired by its own terms at the end of the ten-year period.  If there had been no development, and a vested interest had not accrued, then the payment of delayed land rental would not extend the right to drill after the ten

years given for that purpose. Indeed, if there had been neither development nor payment of rental, simply a paper claim, abandonment would be presumed, if not in some way satisfactorily rebutted. But that is not the case here. A valuable well was drilled. Appellees claim that gas was not *produced;* that it was found, but not marketed, was closed in, and therefore not *produced* within the meaning of the lease which says the lease will be extended as long after the ten years, as gas is' produced from the land. It has been pointed out that there was no market for the gas when the well was drilled, a situation which both the lessor and lessee well knew. What more could be done than to shut it in and conserve it? Lessor treated it as' a producing well. He used gas from it. Its production capacity was gauged at one and one-half million feet per day. However, the lease does not in terms say the well must produce gas in "paying quantities" and be marketed. Having no market, the lessee had the right to shut the gas in and pay the stipulated price. It would be of little concern to lessor what was done with the gas, if he gets his payments. It is true the payments have not been properly made; but in 1917, payment was accepted by the lessor up until January 1, 1918. While there has been no payment since that time, payment is now proffered, less' an unascertained sum for the excessive use of gas by lessor and his privies. Practically the same situation existed in *McGraw Oil Co.,* v. *Kennedy,* 65 W. Va. 595, above cited, although in that case the payments had been tendered before suit. It was there held: "When a producing gas well is developed, but its product not marketed, that fact does not authorize the lessor to forfeit the lease, the lessee being willing to pay the agreed sum for a gas well." The law favors the vesting of estates, and is adverse to their destruction after they have been vested. *Sands* v. *Holbert,* 93 W. Va. 574. Under the facts shown it cannot be held that the lease had expired at the end of the ten-year term.

It appears that there is now a market for the gas. Defendant was the pioneer and found the territory to be productive. The "wildcat" aspect was changed, and leases in

the neighborhood have become valuable.  This lease is now very valuable.  There is equity in the contention of defendant that it should not now be deprived of its lease to favor the vendees of the lessor who, by virtue of the development have been enabled to make a much more profitable lease contract.

For these reasons the decrees will be reversed and the cause remanded, it being apparent that further relief should be given.  McCutcheon and ·Bryant are entitled to a money relief, and defendant is entitled to relief under its cross-bill answer.

*Reversed and remanded.*