**CARTER OIL CO. v. MITCHELL et al.**

**SAME v. HALES et al.**

**Nos. 1740, 1741.**

Circuit Court of Appeals, Tenth Circuit.

Jan. 5, 1939.

Rehearing Denied Feb. 4, 1939.

L. G. Owen and Forrest M. Darrough, both of Tulsa, Okl. (Jas. A. Veasey and Joseph L. Seger, both of Tulsa, Okl., on the brief), for appellant.

Johnson, McGill & Johnson and J. B. Moore, all of Ardmore, Okl., for appellees.

Villard Martin and Conard E. Cooper, both of Tulsa, Okl., amici curiæ.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

On October 4, 1916, A. Mitchell and Dora Mitchell, his wife, executed and delivered to B. T. Head an oil and gas lease upon 200 acres of land in Carter County, Oklahoma.[1] The lease in part read as follows:

"It is agreed that this lease shall remain in force for a term of Five years from this date, and as long thereafter as oil and gas, or either of them, is produced from said land by the lessee."

Head duly assigned the lease to the Carter Oil Company.

On April 27, 1935, the original lessors conveyed a portion of the leased premises to Oscar L. Mitchell.

On March 7, 1936, Oscar L. Mitchell made written demand on the Carter Company either to commence the drilling of a well on certain portions of the lease described in the notice by April 1, 1936, or execute a release to him of the lease as to those portions, and stated if the demand was not complied with he would imme-

---

[1] Hereinafter referred to as "the lease."

diately commence a suit to cancel the lease.

The Carter Company refused to cancel the lease on the ground it had developed and operated the lease as would a reasonably prudent operator.

On July 8, 1936, Oscar L. Mitchell, W. B. Johnson, and H. W. McGill instituted cause No. 1740 against the Carter Company to cancel the lease as to certain lands embraced therein; and W. T. Hales, Oscar L. Mitchell, H. B. Fell, Mrs. B. A. Simpson, B. A. Simpson, Jr., Elizabeth Gregg, Georgia Fell, and W. E. Simpson, trustee of the estate of A. O. Simpson, deceased, instituted cause No. 1741 against the Carter Company to cancel the lease as to certain other lands embraced therein. The two cases were consolidated for trial.

At the trial the Carter Company offered to cancel the lease as to the Hewitt sand.

In the following map the boundaries of the lease are shown in yellow, the portion sought to be cancelled in No. 1740 in red, and the portion sought to be cancelled in No. 1741 in blue, and the wells drilled on the lease and adjoining lands are indicated:

LEGEND
Dark shading BLUE on original
Light shading RED on original
Boundary line YELLOW on original

The plaintiffs are the owners of the oil and gas rights in the lands as to which cancellation is sought.

During 1920, 1921, and 1922, the Carter Company drilled seven wells on the lease. Six produced oil. Five are still producing. Well No. 17 and well No. 21 on adjoining land were dry holes. Wells numbered 4 and 5 in the northwest corner of the lease are locations where drilling rigs were erected and tools moved in preparatory to drilling. These locations were abandoned when wells numbered 1, 2, and 3 on adjoining land to the northwest thereof resulted in dry holes. Well No. 16 is a water well.

In the early part of 1934 production from well No. 7 had substantially declined. In an effort to increase production through cleaning out of the well the tubing and rods were lost in the hole. Efforts to recover the tubing and rods, extending over 40 to 45 days, were unsuccessful. After expending approximately $2,000 in an effort to recondition this well it was abandoned. It would have cost approximately $20,000 to drill and equip a new well at this location and a greater amount to drill the tubing out of the old well. The probable production of a new well would have been about 3 barrels per day. Such a well would not have been profitable. Well No. 6 immediately west of No. 7 is still producing at the rate of about 2½ barrels per day.

In February and March, 1936, the wells on the lease were producing 35 to 40 barrels per day. The production per well ranged from 8 to 9 barrels per day down to 2 to 3 barrels per day.

The lease is what is known as an "edge"[2] lease. The present production is from the Hewitt sand which is located at a depth of about 2200 feet. There is a fault or dip extending from the northwest corner of the lease toward the southeast. It is indicated on the map by a black diagonal line. The production from the Hewitt sand is all west of the fault. The portions of the lease sought to be cancelled are to the east of the fault and are definitely off the structure in the Hewitt sand.

The cost of drilling to the Hewitt sand is approximately $20,000 per well.

For several years prior to 1934 the Carter Company had given consideration to the drilling of a deep test well in the general area of the lease to the Ordovician formation. Negotiations looking to the

---

[2] Located on the edge of the oil bearing structure.

drilling of the first test well were carried on in 1934, and in the latter part of that year the Carter Company, in conjunction with three other oil companies, commenced the drilling of what is known as the Ruth Williams well. It was completed to the Ordovician formation on October 24, 1935. Its initial production was 3000 barrels per day. It was drilled to a depth of approximately 8000 feet and cost approximately $260,000. It is located approximately 13 miles north and west of the lease.

The Carter Company had made geological investigations in the Hewitt field and discovered a structure in the Ordovician formation underlying the lease comparable to the one on which the Ruth Williams well was drilled. It believes commercial production will be found on the lease in that structure. It had planned to drill a test well on such structure at the time the demand for cancellation was received. Prior to October, 1936, it had acquired necessary adjacent acreage, and commenced negotiations with other oil companies for the drilling of the test well. In 1937 it included the cost of such a well in its 1938 budget. At the time of the trial, October, 1937, it was arranging for the drilling of the test well at the top of the structure, located about one mile west of the west boundary of the lease. It is prudent to drill the first test well at the top of the structure. The Carter Company estimates that the test well will cost $250,-000. This well when completed will afford valuable geological information respecting the portion of the structure underlying the lease. The available geological information indicates oil in commercial quantities will be found therein. Unless the test well indicates the contrary, the Carter Company intends to proceed with the orderly development of the Ordovician formation under the lease.

Caution must be exercised in drilling deep test wells. Structural information must be carefully worked out. Since the cost is very great wider spacing of wells must be provided for and each well must be protected with ample acreage; in other words, an orderly development program must be worked out in advance with the lessors and other operators. This takes time and much effort.

The Carter Company has completed a second deep well to the Ordovician formation and is drilling a third in the vicinity of the Ruth Williams well. Development of the structure on which the Ruth Williams well was drilled has greatly increased the value of leases in Carter County, including the area in which the lease is located.

The Carter Company is not engaged in speculative enterprises. For many years it has been actively engaged in the development and operation of oil and gas leases and the production of oil and gas therefrom. It is one of the larger American producing companies. Its position in the oil industry is so prominent that these are facts of common knowledge. There is no suggestion that it is lacking in ability, financial or otherwise, to fully develop the lease to the Ordovician formation.

The trial court found that well No. 7 was lost through no fault of the Carter Company; that under the existing facts and circumstances it was not required to drill a new well to offset well No. 6; that there was a fault in the Hewitt sand under the leased premises; that all of the producing wells are west of the fault; that the portions of the lease sought to be cancelled are east of the fault; that exploration and geological information showed there was no reasonable expectation of finding production in the Hewitt sand east of the fault. It further found that geological information disclosed likelihood of production in the Ordovician formation under the lease; that the Carter Company expected to drill to that formation near the lease; and intends to carry out further development on the lease in that formation, conditioned, however, on the results obtained by the test well. On authority of Sauder v. Mid-Continent Petroleum Corp., 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255, 93 A.L.R. 454, it decreed cancellation of the lease as prayed for in the complaints. The Carter Company has appealed.

We are of the opinion that the instant cases are clearly distinguishable from the Sauder Case. Two wells were drilled on the Sauder lease covering 360 acres. Cancellation was sought as to 320 acres which were entirely undeveloped. In the immediate vicinity thereof a number of wells were producing from the Bartlesville sand and the Mississippi lime. The trend of the Mississippi lime was toward and under the portion sought to be cancelled. The lessee's geological information was unfavorable to but did not definitely condemn the portion sought to be cancelled.

Many of the producing wells in the area were from the Mississippi lime, found at a depth approximately the same as the lessee's geologist believed the Mississippi lime would be found under the southerly half of the portion sought to be cancelled. The lessee, though unwilling to further develop to the known producing horizons, insisted on holding the lease. The lessee had done nothing in the way of developing on or near the portion sought to be cancelled, and more than 16 years had elapsed since the making of the lease. It had no intention of further developing on or near the leased premises unless the development of other oil operators should indicate the probability of oil in commercial quantities under the undeveloped portion.

In the instant cases six producing wells and one dry hole had been drilled on a lease embracing 200 acres. Only dry holes had been drilled on premises adjacent to the portion sought to be cancelled. The Hewitt sand was the only proven producing horizon. The undeveloped acreage was east of a geological fault, and the producing wells were all west thereof. Drilling and geological investigation condemned the undeveloped portions of the lease with respect to the Hewitt sand. The Carter Company offered to cancel the lease as to the Hewitt sand. The Carter Company had drilled a test well to the Ordovician formation in the general area, had discovered a structure in that formation underlying the lease, and was proceeding with the development thereof as hereinbefore stated.

In the Sauder Case the lessee refused to proceed with further development, unless future developments by other operators on adjacent lands should indicate the probability of finding oil in paying quantities on the undeveloped portion of the Sauder lease, and at the same time insisted on holding the entire lease. In the instant cases, while the Carter Company refused to drill any further wells on the Hewitt sand on the portions of the lease sought to be cancelled because it did not

think it prudent so to do, it indicated a willingness to do equity by cancelling the lease as to those portions as to the Hewitt sand and higher horizons. With respect to the Ordovician formation, not only had the Carter Company not refused to drill further wells to that formation, but it was proceeding in an orderly way toward the exploration of the structure underlying the lease in that formation and manifested clearly its intention to go forward with the development thereof.

Furthermore, there was no issue of abandonment in the Sauder Case. The Supreme Court said, 54 S.Ct. 672:

"The question for decision is whether the respondent failed to comply with an implied covenant to develop the tract with reasonable diligence."

The decree was not predicated on abandonment. This is clearly demonstrated by its terms. The court did not order unconditional cancellation, but decreed that the undeveloped portion of the lease should be cancelled unless within a reasonable time a test well should be drilled thereon to the Mississippi lime. Had there been an abandonment the lessee's rights would have been at an end. Abandonment terminates the lessee's title.[3]

In the instant cases plaintiffs tacitly concede there was no breach of any implied covenant and in their brief rely solely on abandonment. They say:

"As we view these two suits, the only question now before the court is whether or not the trial court erred in holding that this lease, or the purposes of the lease had been abandoned by the defendant, insofar as it affects the lands upon which they seek to cancel the lease."

The burden of proof was upon the plaintiffs to establish either a breach of an implied covenant with respect to the portions of the lease sought to be cancelled or an abandonment of such portions.[4]

---

[3] Fox Petroleum Co. v. Booker, 123 Okl. 276, 253 P. 33, 37; Robinson v. Jacobs, 113 Tex. 231, 254 S.W. 309, 311; Cox v. Sinclair Gulf Oil Co., Tex.Civ.App., 265 S.W. 196, 201; Wisconsin-Texas Oil Co. v. Clutter, Tex.Civ.App., 258 S.W. 265, 267; Frick-Reid Supply Corp. v. Meers, Tex.Civ.App., 52 S.W.2d 115, 119; Logan Natural Gas & Fuel Co. v. Great Southern Gas & Oil Co., 6 Cir., 126 F.

623, 626; Rawlings v. Armel, 70 Kan. 778, 79 P. 683, 685; Harris v. Riggs, 63 Ind.App. 201, 112 N.E. 36, 38.

[4] Ramsey Petroleum Corporation v. Davis, Okl.Sup., 85 P.2d 427; Wilcox v. Ryndak, 174 Okl. 24, 49 P.2d 733, 735; Goodwin v. Standard Oil Co. of Louisiana, 8 Cir., 290 F. 92, 98; Orr v. Comar Oil Co., 10 Cir., 46 F.2d 59, 63.

In order to comply with the implied covenants of a lease to drill offset wells and to diligently develop the lease, a lessee must do that which, under the circumstances, an operator of ordinary prudence, having regard to the interests of both lessor and lessee, would do.[5]

In Ramsey Petroleum Corporation v. Davis, Okl.Sup., 85 P.2d 427, decided Dec. 20, 1938, the court said:

"unquestionably the prevailing test in this state is the ordinary prudent operator standard. * * * But in each instance, depending on the particular circumstances, many factors must be considered, including: (1) location of lease premises—whether in wildcat territory, or producing field, (2) probable quantity of oil and gas capable of being produced from the lease premises as indicated by the prior development, (3) market conditions and transportation facilities, (4) the extent and result of operation on adjacent lands, (5) the extent of the area which is normally drained by a well in that field, (6) the character and extent of the subsurface structure and sand in that area, (7) the expense necessary to secure production and operate producing wells for protection against drainage, (8) whether the well to be offset is producing oil or gas in paying quantities, (9) usage of the business, and cost of drilling, producing, and marketing. Brewster v. Lanyon Zinc Co. [8 Cir., 140 F. 801]; Merrill, Covenants Implied in Oil & Gas Leases, 193 et seq. The burden of proving the breach of these implied covenants is upon the plaintiff. Thornton, Oil and Gas § 527; Brewster v. Lanyon Zinc Co., supra. In view of the nature of the factors to be considered, it may be said, generally speaking, that the lessor, in order to prove a breach of the covenant to drill additional wells, must show that the additional well would probably produce sufficient to repay the expense of drilling, equipping and operating such well and also produce a reasonable profit on the entire outlay. * * *

"(b) Regarding the duty to drill offset wells to protect against drainage, although generally the same factors should be taken into consideration, yet an additional requirement is that the lessor prove that the adjoining wells are draining to a substantial amount. Eastern Oil Co. v. Beatty [71 Okl. 275, 177 P. 104]."

Because of the small amount of probable production a reasonably prudent operator would not have drilled a new well to take the place of well No. 7. Furthermore, there was no proof that well No. 6 was draining a substantial amount of oil from the leased premises.

Because of the fault and the fact that wells numbered 1, 2, 3, 17, and 21 came in as dry holes, a reasonably prudent operator would not have drilled additional wells to the Hewitt sand on portions of the lease sought to be cancelled. The discovery of oil in commercial quantities therein was very improbable.

Likewise, we think plaintiffs failed to prove breach of the implied covenant to diligently develop the portions of the lease sought to be cancelled with respect to the Ordovician formation. In fact, the plaintiffs offered no proof with respect to the development of that formation. The only evidence bearing thereon was brought forth by the Carter Company itself. True, that proof only went back to "several years prior to" 1934. But it is only in recent years that improvements in drilling machinery and methods have made it possible to drill to formations lying as deep as 8,000 feet. There was no proof of unreasonable delay on the part of the Carter Company in discovering the structure in the Ordovician formation underlying the lease or in proceeding with the development thereof. True, it drilled the first deep test on the Ruth Williams structure, but that test afforded valuable information respecting the lease because of the similarity of the two structures. It may be conceded that the Carter Company proceeded with great caution, but the hazards and costs of such deep test wells justify caution. It had made the geological investigations, proceeded toward the acquisition of the necessary additional acreage, and was going forward with plans to test the structure underlying the lease when the demand for cancellation was made. At the

---

[5] Ramsey Petroleum Corporation v. Davis, supra; Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069, 1071, 1072; Mercer v. American Oil & Refg. Co., 173 Okl. 515, 49 P.2d 101, 102; Indian Territory Illuminating Oil Co. v. Haynes Drilling Co., 180 Okl. 419, 69 P.2d 624, 626; Denker v. Mid-Continent Petroleum Corp., 10 Cir., 56 F.2d 725, 727, 84 A.L.R. 756; Orr v. Comar Oil Co., 10 Cir., 46 F.2d 59, 63.

time of the trial it was about to commence drilling the first test well.

█ We conclude that the evidence and the findings of the trial court did not warrant cancellation for breach of implied covenant under the Oklahoma decisions.[6]

█ The issue of abandonment presents a question of local law and must be determined in accordance with Oklahoma decisions.[7]

█ There may be abandonment as to a portion of a lease embracing all the formations underlying that portion, and not as to the remainder of the lease. Likewise, there may be abandonment as to one formation underlying a lease and not as to the other formations underlying it.[8]

█ To constitute abandonment there must be an intention on the part of the lessee to relinquish the leased premises or some portion thereof. The earlier Oklahoma cases held that to constitute abandonment there must be a concurrence of an unequivocal intention to abandon and actual relinquishment of the premises.[9]

█ However, in the later case of Fox Petroleum Co. v. Booker, June 1, 1926, 123 Okl. 276, 253 P. 33, the court held that the rule requiring actual relinquishment of the premises as well as an intention to abandon applies only to physical property, and has no application to abandonment of the intangible rights creted by an oil and gas lease where the lessee acquires no title to the minerals, and that abandonment is a question of intention, to be determined by the circumstances surrounding each particular case. See, also, Hudspeth v. Schmelzer, 182 Okl. 416, 77 P.2d 1123, 1125.

█ Even under this liberal doctrine of abandonment there must be a present intention not to drill at any time in the near or remote future. See Wing v. Edwards, 175 Okl. 642, 54 P.2d 351. In its first opinion in Ramsey Petroleum Corporation v. Davis, 85 Okl.App.Ct.Rep. 413,[10] the Supreme Court of Oklahoma in affirming the decree below cancelling a portion of an oil and gas lease said:

"There can be an abandonment of the whole lease or a portion of the lease, de-

---

[6] Ramsey Petroleum Corporation v. Davis, supra; Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069; Galloway v. Kroeger, 169 Okl. 645, 34 P.2d 250; Mercer v. American Oil & Refg. Co., 173 Okl. 515, 49 P.2d 101; Wilcox v. Ryndak, 174 Okl. 24, 49 P.2d 733; Indian Territory Illuminating Oil Co. v. Haynes Drilling Co., 180 Okl. 419, 69 P. 2d 624.

[7] Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

[8] In Fox Petroleum Co. v. Booker, 123 Okl. 276, 253 P. 33, the court said [page 38]:

"Our conclusion from a careful study of the cases on abandonment is that there can be an abandonment of the whole lease by the lessee, based upon an intention to abandon, so there can also be an abandonment of a portion of the lease. * * *

"The principle, as we understand it, is that development of every part of the lease is an implied condition. Therefore, whether the undeveloped portion be a single tract remote from the rest, or a considerable portion of a very large tract, or a deeper stratum, the existence of which may be doubtful, * * * it is an implied condition that the lessee will test every part. When he abandons all further testing and disclaims any obligation

to test, he may be required likewise to surrender all claim to the property.

"It may be said that the lease is an entire contract, but this lease, like most leases, itself provides for a subdivision. Moreover, the numerous cases in which this court has sanctioned cancellation of a part of the lease bear witness to the severability of the rights and obligations created by the instrument."

In Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069, the court said [page 1071]:

"Where the evidence discloses that a part of the leased premises has been properly developed with reasonable diligence by the lessee and other parts have not, a court of equity will cancel the lease as to the undeveloped part, but may permit the lessee to continue to operate the developed part thereof."

[9] Scott v. Price, 123 Okl. 172, 247 P. 103; Dow v. Worley, May 11, 1926, 126 Okl. 175, 256 P. 56; Blackwell, Oil & Gas Co. v. Whited, 81 Okl 45, 196 P. 688.

This is the rule in other oil and gas states. See Jacobs v. Robinson, Tex. Civ.App., 241 S.W. 241, 243; Cadillac Oil & Gas Co. v. Harrison, 196 Ky. 290, 244 S.W. 669, 691; McCutcheon v. Enon Oil & Gas Co., 102 W.Va. 345, 135 S.E. 238, 240.

[10] Ed. Note: opinion withdrawn from publication.

pending upon the intention. Fox Petr. Co. v. Booker, supra. If the lessee intends to abandon the purpose of the lease, he will be held to have abandoned the land which was granted as an incident to the enterprise. Mills-Willingham, Oil & Gas, p. 166. But there should be a present intention not to drill at any time in the near or remote future. Wing v. Edwards, 1936, 175 Okl. 642, 54 P.2d 351."

On rehearing the court reversed the decree below on the ground abandonment was not an issue in the trial court and could not be raised for the first time in the appellate court, but the first opinion indicates the court's adherence to the view that there must be a present intention not to drill at any time in the near or remote future.

 The production manager of the Carter Company testified that it never had any intention to abandon any part of the lease. This was competent evidence.[11]

The Carter Company had drilled a deep test well to the Ordovician formation in the general area of the lease and was continuing its development in the vicinity of that well. For the reasons above indicated, that development furnished valuable information respecting the Ordovician formation underlying the lease and substantially increased the value of the lease.

 The Carter Company had also made a geological investigation in and about the lease in the Ordovician formation, had discovered a structure, a portion of which underlies the lease, and had been proceeding with plans for drilling a well to test that structure, all prior to the demand for cancellation. It had included the cost of the test well in its 1938 budget, and at the time of the trial it was proceeding with arrangements to drill such test well. Unless the test indicated the existing opinion of its geologist was wrong, it intended to proceed with an orderly development of the lease in the Ordovician formation. Clearly, it cannot be said that the Carter Company had "a present intention not to drill at any time in the near or remote future" to the Ordovician formation on the portions of the lease sought to be cancelled. On the contrary, its course of action over a period of years in the general area and with respect to the structure in the Ordovician formation underlying the lease showed it had a present intention to develop that structure by the drilling of a test well on the top thereof within one mile of the lease, and to continue development in that formation under the lease unless the test should show it was not warranted. It clearly had not abandoned the lease as to the Ordovician formation.

We are of the opinion that the decrees should have limited cancellation to the Hewitt sand and higher producing horizons. The causes are reversed and remanded with instructions to modify the decrees in accordance with this opinion.

Reversed and remanded.

---

[11] See Blackwell Oil & Gas Co. v. Whited, 81 Okl. 45, 196 P. 688, 692; Hudspeth v. Schmelzer, supra, 77 P.2d page 1124.