# CHARLESTON.

OHIO FUEL OIL CO. V. THOMAS H. GREENLEAF *et als.*

Submitted April 22, 1919.   Decided April 29, 1919.

1. QUIETING TITLE—*Jurisdiction—Removal of Cloud on Title.*
    Equity has jurisdiction at the suit of the holder of a valid oil and gas lease, to remove as a cloud upon his rights a subsequent lease executed to a stranger by the lessor covering the same tract of land.   (p. 73).

2. MINES AND MINERALS—*Oil and Gas Lease—Corporations—Time.*
    An oil and gas lease for a term of one year, and as long thereafter as oil or gas is produced from the demised premises, will not justify operations thereon after the expiration of the specified term of one year mentioned therein, unless within said one year oil or gas has been produced in paying quantities, or unless within such time the lessee has demonstrated that the land is underlaid with oil or gas, and is at the expiration of the time making diligent and efficient efforts to produce it in such paying quantities.   (p. 74).

3. SAME—*Oil and Gas Lease—Operation—Time.*
    While in such a lease time is ordinarily of the essence of the contract, a proper construction of the language used will not limit the lessee to the particular term mentioned in the lease, where it appears that he has demonstrated that the leased land is underlaid with oil or gas, and is proceeding with all diligence in an efficient manner to produce the oil or gas therefrom in paying quantities. The parties in making such a contract will be taken to have contemplated that operations might be delayed by contingencies not easily foreseen, and to have meant that the lessee's right would not be terminated if he was by such unforeseen contingencies prevented from producing oil or gas in paying quantities within the specified term.   (p. 74).

4. SAME—*Oil and Gas Lease—Operation—Time—Estoppel.*
    Where the lessor in an oil and gas lease, by his conduct and by accepting benefits thereunder, leads the lessee to believe that he will not insist upon the production of oil in paying quantities within the specified term provided in the lease as a condition of the right of the lessee to continue such production, he will not, on the expiration of such term, be allowed to say that the lessee's rights are at an end, where the lessee is at such time diligently prosecuting the work of exploration in such manner as may reasonably be expected to produce oil or gas from the premises in remunerative quantities.   (p. 74).

Appeal from Circuit Court, Roane County.

Suit by the Ohio Fuel Oil Company against Thomas H. Greenleaf and others for the cancellation of an oil and gas lease, made by part of defendants to other codefendants. Decree for plaintiff, and defendants appeal.

*Affirmed.*

*Harper & Baker* and *Chas. E. Hogg,* for appellants.

*R. G. Altizer, O. J. Wilkinson* and *Pendleton, Mathews & Bell,* for appellee.

RITZ, JUDGE:

This appeal brings up for review a decree of the circuit court of Roane county, by which a lease for the production of oil and gas, made by the defendants John H. Greenleaf, Thomas H. Greenleaf, Eliza Haidet and J. F. Greenleaf to the defendants K. C. Simmons, F. F. McIntosh, Jeff Miller and W. L. Stevens, was cancelled and set aside as a cloud upon the rights of the plaintiff to produce oil from the tract of land covered thereby under a lease held by it.

There is no substantial controversy as to the material facts. Prior to February 3, 1917, M. M. Greenleaf, a married woman, departed this life, being the owner at the time of her death of a tract of about thirty-seven acres of land. This land descended to the defendants Thomas H. Greenleaf, John H. Greenleaf and Eliza Haidet, her children, subject to the courtesy of her husband, the defendant J. F. Greenleaf. These parties, on the 3rd of February, 1917, executed a lease of said land for oil and gas purposes to Giles Edwards, John M. Harper, V. L. Harper and Kate Simmons. This lease was for and during a term of one year after the said 3d of February, 1917, and as long thereafter as oil or gas should be produced from said land. It also provided that the lessees should deliver to the lessors, in tanks or pipe lines, one-eighth of all the oil produced and saved from said premises as royalties, and pay for each gas well, while gas should be sold therefrom, the sum of seventy-five dollars for each three months; and further covenanted that the lessors should be entitled to gas free of cost for heat and light in one dwell-

ing house on said premises, from any gas well thereon, so long as the lessees should operate the same, and the pressure of such gas might be sufficient for such use. The lessees in this lease associated themselves with other parties, forming a partnership under the name of Citizens Oil Company for the purpose of developing this tract of land, and the interest of the several parties therein was adjusted among them. It further appears that in this vicinity oil is ordinarily found in what is known as the "Big Injun" sand. The Citizens Oil Company, very shortly after obtaining this lease, in the spring of 1917, began drilling a well upon the property. This well was driven through the "Big Injun" sand at a depth of something more than two thousand feet, and at a cost of more than four thousand dollars. Some oil was produced therefrom, but not in large quantities. It was then shot with forty quarts of nitroglycerine with a view to increasing the production, but it seems that this had little if any effect upon the amount of oil produced. During the time it was operated by the Citizens Oil Company an iron tank was provided in which the oil produced was stored, and it is testified by the defendant J. F. Greenleaf that this production amounted to some eight or ten barrels. On the 26th of June, 1917, the Citizens Oil Company sold and transferred to the plaintiff in this case the lease on said thirty-seven acres of land, together with the well that had been drilled thereon as aforesaid, and all of the materials, including the casing, tubing, rig, and other materials used in connection therewith, for the sum of six thousand dollars in cash. Immediately thereafter, with a view to increasing the production of oil in said well, plaintiff had it shot with eighty quarts of nitrogylcerine, and after cleaning it out installed a pump in the well, and started to pump the oil therefrom. For a few days the pumping was done each day, but it was discovered that the amount of oil produced was so inconsiderable that there was no necessity for pumping more than once a week, so that thereafter, from about the first of September, 1917, until in January, 1918, the well was pumped once a week, and small quantities of oil produced therefrom. This pumping was mostly done by the defendant J. F. Greenleaf, who

was employed by the plaintiff for that purpose. Greenleaf testifies that on the last two occasions on which he pumped the well it produced no oil, and on the last occasion on which he attempted to pump it the pump would not work. Altogether it appears from the evidence that this well produced during the time it was pumped as aforesaid from twenty-five to fifty barrels of oil which, it is conceded, at the market price, would not pay for the cost of pumping the same, and none of which was ever delivered in pipe lines or tanks to the credit of the lessors. In the early part of December, 1917, it is shown that the defendant John H. Greenleaf, representing himself and his brother and sister, all of whom lived in Ohio, came to Roane county for the purpose of looking after their interests in this oil property. It was decided in conference between said John H. Greenleaf and his father, J. F. Greenleaf, that the well then being pumped was not paying the expense of pumping, and that if the plaintiff desired to locate another well on the land the lessors would have no objection to the cessation of the operation then being conducted, and the removal of the material used in this well to another point on the land where it might be considered that oil in larger quantities could be secured. J. F. Greenleaf communicated this fact to an agent of the plaintiff at its office at Spencer, and this agent wrote to the general manager of the company giving him this information, but it appears no answer was ever made to the Greenleafs to their proposition. However, on the 17th of January, 1918, the general manager of the plaintiff directed its engineer to locate another well on the premises. The engineer, because of the serious illness of his wife, was unable to go upon the ground and make this location until the 6th of February, 1918, three days after the lease expired, according to the contention of the defendants. After this well was located on the ground the plaintiff on the 6th of February, pumped the oil well for the last time, securing therefrom several barrels of oil. They then pulled the casing and tubing therefrom, plugged it up, and began the removal of this material, together with the rig, to the new location. The work of removing the material was accomplished, and drilling began at the new location the

latter part of the month of February, 1918. The defendant
John H. Greenleaf came to Roane county again about the
21st of February, 1918, with a view to re-leasing the property
to the plaintiff or making a lease to someone else therefor,.
upon the theory that the lease then held by the plaintiff had'
expired in accordance with its terms on the 3d of February.
He met an agent of the plaintiff and .advised him of his:
purpose. This agent, it appears, had no authority to act for
the plaintiff, but at his request Greenleaf took no action to-,
ward leasing the property to others, or toward evicting the-
plaintiff therefrom, until the general manager of the plain-
tiff could be communicated with. · The plaintiff's general'
manager was immediately advised by telephone that Green-
leaf was on the ground and was preparing to lease the prop-
erty to others, and evict the plaintiff therefrom, and together·
with the company's general attorney replied that he and the
said attorney would be in Spencer on the following Monday,·
the 25th of February, for the purpose of adjusting, if pos-
sible, the contentions of Greenleaf. Plaintiff's general mana-
ger and general attorney did go to Spencer on the 25th of
February, and they there met John H. Greenleaf, who was
acting for himself and the other interested parties. Green-
leaf demanded two thousand dollars in cash for the execution
·of a new lease on the premises, which demand was refused.
He was finally offered three hundred dollars, however, as the
plaintiff's general manager and general attorney contend, to
satisfy him and prevent any litigation over the lease, and to
allow the plaintiff to go on with the development under the
lease it then had, and as he contends for a new lease.
It is not very material who is correct about this transaction
inasmuch as it clearly appears that each side clearly under-
stood the other's contention, the plaintiff's contention being
that it had a right to continue operations under the lease
it had, and Greenleaf contending that it had no such right,
but that that lease had expired with the 3d of February,
1918. The parties were unable to reach any understanding,
and on the 26th of February the Greenleafs served notice on
plaintiff's general manager requiring it to surrender the pos-
session of the premises and to cease operations thereon, and

on the 28th of February they executed a lease to the defendants K. C. Simmons, F. F. McIntosh, Jeff Miller and W. L. Stevens for the purpose of producing oil from this same tract of land. On the 2nd of March, 1918, said Lessees brought suit in unlawful entry and detainer in the circuit court of Roane county against the plaintiff, having for its purpose the recovery of possession of said tract of land, and fifty dollars damages for the detention thereof. The summons in this suit was made returnable to the 15th of March. On the 13th of March plaintiff filed its bill in this case praying that said lease made on the 28th of February, 1918, be cancelled and annulled as a cloud upon its right to produce oil from said tract of land, and asking that the action of unlawful entry and detainer be enjoined. A temporary injunction was granted on that day. Subsequently the defendants filed their answer, the evidence was taken, and a hearing had on the 23d of May, 1918, at which time a decree was entered perpetually enjoining the prosecution of said action of unlawful entry and detainer, and cancelling and annulling the lease of February 28, 1918, as a cloud upon the right of the plaintiff to conduct its operations for oil upon the said thirty-seven acre tract of land. In the meantime plaintiff continued its operations and succeeded in completing a second well on said land a short time before the hearing, which well it is shown produced oil in paying quantities, the production therefrom being approximately ten barrels a day. During the time the well was being pumped for oil it is shown that it made what is called casing head gas in small quantities, and this gas was conducted through a pipe provided for the purpose to the residence occupied by the defendant J. F. Greenleaf on the tract of land, and was by him there used in fulfillment of the requirement of the contract of lease to furnish gas for one dwelling situate upon said premises. At the time the well was dismantled on the 6th of February, 1918, this pipe was disconnected, and upon the demand of said J. F. Greenleaf was connected to another pipe supplying gas to the plaintiff in its operations, in order that the defendant Greenleaf's gas supply might not be cut off. In this way he was furnished gas not produced upon the premises,

but at the expense of the plaintiff. It also appears that at the time the lease was made in February, 1917, there was some oil development in the vicinity of this tract of land, there having been some four or five small wells drilled and at that time in operation, and during the year from February, 1917, to February, 1918, several more wells were drilled in still closer proximity to the land, the most substantial of these being one drilled on an adjacent tract of land which began to produce oil on the 18th of January, 1918, and which was located near the boundary line of the thirty-seven acre tract of land farthest from the well which had theretofore been drilled thereon, and it was largely to offset this well, as the plaintiff contends, that it located its well No. 2 which has since been completed and developed into a substantial producer of oil.

The issues in this case are very clear cut, and depend upon the application of legal principles to a state of facts about which there is no substantial controversy. The first contention of the defendants, who are appellants here, is that equity has no jurisdiction to entertain this bill, for the reason that the plaintiff in this case could have set up all the matters it now relies upon in defense of the action of unlawful entry and detainer.

It is conceded by the evidence that the plaintiff is in possession of the tract of land in controversy, and that the owners thereof, the Greenleafs, deny its right to the possession, and have executed a second lease to their co-defendants for the production of oil therefrom. In the case of *Monarch Gas Co.* v. *Roy,* 81 W. Va. 723, it was held at page 731 of the opinion: "The right to entertain the suit and grant relief is settled in this jurisdiction by the decisions cited infra, reference to which suffices to show equity is the proper forum to adjudicate all issues arising between claimants under conflicting oil and gas leases executed by the same lessors or those holding under them on the same tract of land." In *Carbon Black Co.* v. *Ferrell,* 76 W. Va. 300, it was held: "Equity may, at the suit of the holder of a valid oil and gas lease, whose rights have become vested by the production of oil or gas, enjoin the lessor from creating a cloud on his

title by executing to a stranger another lease on the same property, if it is made to appear with reasonable certainty such cloud will be created unless judicially prohibited.'' The same doctrine was announced in *Mustard* v. *Big Creek Development Co.*, 69 W. Va. 713; *Peterson* v. *Hall*, 57 W. Va. 535; and *Pyle* v. *Henderson*, 55 W. Va. 122. These authorities settle the proposition of jurisdiction and clearly sustain the right of the plaintiff to maintain this bill to cancel the lease executed by the Greenleafs to their co-defendants, if under the facts it appears that it has a valid and subsisting right to produce the oil from said land.

The plaintiff's contentions in this case are that by the discovery of oil within the one-year term named in the lease, even though in unremunerative quantities, it became vested with the right to extract all of the oil and gas from the leased premises at any time thereafter it might choose to make explorations therefor; that this right did not terminate with the expiration of the particular term mentioned in the lease, and was not dependent upon the production of oil or gas in paying quantities within that term, or at any other time; and further, that even though it would ordinarily be limited to the specified term of one year named in the lease for the production of oil or gas in paying quantites, the lessors by their conduct are estopped to deny its right to go on and prosecute the operations on said land, at least to the extent of drilling another well thereon; and, of course, if this other well produces oil in paying quantities, by the very terms of the lease, it would be in force so long as such conditions continue. The first of these contentions is not tenable. The rights of the parties under the lease depend upon its proper construction. The purpose of the lessors in making this contract was to have the oil and gas on these premises produced and marketed, so that they might receive their royalties therefrom, and under our holdings this purpose is a material element to be considered in the interpretation of the contract. It is true some of our cases say that when oil or gas is discovered under a lease such as this an interest becomes vested in the lessee, and the plaintiff in this case construes this to be an interest continuing beyond the term of

the lease.  As to just what is meant by this interest is very clearly stated in the fourth point of the syllabus in the case of *Eastern Oil Co.* v. *Coulehan,* 65 W. Va. 531, as follows: ''The discovery of oil or gas under a lease giving right of exploration and production, unless there is something in the lease manifesting a contrary intention, is sufficient to create vested estate in the lessee in the exclusive right to produce oil or gas provided for therein—a right, however, which may be lost by abandonment, by failure to produce oil or gas, *or pursue the work of production, or development of the property.*'' It will be noticed from this language that this interest is the exclusive right to produce oil or gas from the leased premises, and further that the continued existence of this interest depends upon the continued vigilant pursuit of these minerals.  It was never intended in any of the cases cited by counsel for the plaintiff that the lessee in an oil and gas lease might sink a well upon the leased premises, discover a trace of oil or gas, then lie idle, and insist that this discovery vested in him a right to produce the oil and gas from the land at any time he might choose to operate thereon in the future.  It is true that the fact that a well is drilled in on the premises, and does not produce oil in paying quantities, does not exhaust the lessee's right under the lease to continue his efforts to get oil.  This right continues to the end of the term named in the lease, and if he does not, before the end of such term, produce such oil in the quantities contemplated by the contract, his right to further explore therefor ceases.  In construing such a lease-contract as this, this Court has held that the purpose of the parties being to produce the oil, it would not be given a harsh and unreasonable construction; that the words used will be read in the light of the subject-matter with which the parties are dealing, and the end sought to be attained by them.  So construing the language of the contract it has been held that the specified term mentioned in the lease might be extended beyond the expiration of the time fixed by its literal terms.  This extension of the time within which the lessee may produce oil in paying quantities, so as to meet the requirements of the lease, does not depend on anything other than the

proper construction of the contract. This position is made clear in the case of *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438. The Court in the opinion in that case very clearly places this right to continue explorations after the specified term mentioned in the contract upon its proper construction, Judge POFFENBARGER saying: ''May we not, therefore, say the qualifying clause 'as oil or gas is produced' really means 'as long as the premises are diligently and efficiently operated, provided minerals shall have been discovered within the fixed term?' '' and at pages 451 and 452 of the opinion in that case, the proper rules for construing such contracts, and arriving at the real meaning of the parties, are clearly discussed and concisely stated as follows: ''In the interpretation and application of a contract, the spirit and purpose of the instrument as well as its letter must be regarded, and made effective in all directions and as to all parties. This rule is well nigh universal and is often enforced to the extent of restraining within reasonable limits general and indefinite terms, literally importing consequences plainly variant from the true intent and purposes of the parties, ascertained from consideration of the whole instrument, read in the light of their situation and the circumstances surrounding them at the date of its execution. This rule was emphasized in favor of the lessor in *Parish Fork Co.* v. *Bridgewater Co.* and others both prior and subsequent. It is equally applicable in favor of the lessee when the terms and conditions warrant its application. He takes upon himself enormous risks and burdens in consideration of his covenants when he drills a well on the leased premises. It is going too far to say either party, at the time of the execution of the lease, intended general and indefinite terms employed by them to be used as instruments of extreme hardship by the operation of technical rules. The clauses operative within the specific term are uniformly construed and applied so as to work out equitable and just results. A ''dry hole'' does not end the lease under a clause forfeiting for failure to drill a well within a stipulated time. Mere discovery of mineral vests an estate and, without actual production, gives right to continue operations. Cessation of

actual production is excused by adverse conditions and miscarriages which must have been contemplated by the parties, though not specified in the lease. The tests of duty and right are diligence and good faith in almost all cases when the terms, read in the light of the conditions and circumstances, will permit their observance.''

''Is the situation here such as may occur under any oil and gas lease, drawn as this one was? If so, both parties must have intended an equitable and just result under the circumstances, if the terms used will permit it, for they must be deemed to have foreseen and contemplated it. It is matter of common knowledge that no man can estimate the exact time within which a well can be completed, and that delays due to accidents, trivial and grave, and other causes beyond the possibility of accurate anticipation will occur. Adherence to the strict letter of the extension clause would make no allowance for any of these, and inflict disastrous losses upon diligent and honest lessees in many instances, a consequence plainly not within the intent of either party. These leases are drawn for all sorts of territory, some known to be rich in minerals, and others not known to contain any, and their terms are varied to allow for such differences. In territory remote from actaul and profitable operation, leases are often taken, without reasonable expectation of any immediate advantage to the lessor other than a rental in the form of delay money, and with the expectation of delay in drilling until neighboring lands are shown to contain the minerals, and the consequent establishment of probability of the existence thereof in the leased premises. Such seem to have been the conditions under which this lease was taken, as it was for a long term and imposed no obligation to drill a well. In delaying the work until the last quarter, the lessee acted within the terms of the lease and manifested no lack of diligence. Then it discovered and actually produced oil within the term, and continues to do so in fulfillment of the letter of the contract. The facts do not warrant an inference of bad faith. There was no lack of diligence unless failure to commence and complete the well at an earlier date constitutes it, and we are unable to say it does. In this result the

lessors obtain all they contemplated or expected at the date of the execution of the contract. Their property has been drilled and its character as oil territory revealed, and the senior lessee is as capable of making it yield them profit as the appellant. They lost nothing but the advantage of a better contract, a thing not guaranteed by the lease.'' The opinion in the Snodgrass case recognizes that there is some uncertainty as to the basis of this right to continue operations after the particular period mentioned in the lease, and with the view of establishing the doctrine upon a firm basis all prior decisions of this court are reviewed and the conclusion reached that it stands entirely upon the construction of the contract. It is not unreasonable to say that when the parties made such a contract as this contemplating the production of oil, they had in view that by the happening of some untoward event, or the failure of the lessee's expectations to be realized within the time that might reasonably be expected, the lessee might be delayed beyond the term of the lease in producing oil or gas in paying quantities, but if he was diligently and efficiently prosecuting the work of development at the time the particular term ended, according to the language of the contract, and had theretofore demonstrated that the land was oil-producing land, the parties contemplated that he might continue at least the operations in which he was then engaged to their completion, and if such operations resulted in the production of oil or gas in paying quantities, they would have the same result under the other clause of the lease extending it beyond the fixed term as though this result had been accomplished during such period. Such operations, however, to be effective, must be vigorous, diligent and efficient, convincing that the real purpose is to strike ''pay dirt'' at the earliest moment possible. In this case it was demonstrated in the summer of 1917 that this land would produce oil, the production at that time not being in remunerative quantities. The plaintiff thereafter took no steps to further develop the property except to shoot the well which had been drilled and to pump it. This work did not result in producing oil as contemplated by the contract. It was under no obligation to drill another well, or to make

any further effort to produce oil, unless it wanted to; it could go on to the end of the year without such effort, but if at the end of the year it was not producing oil in paying quantities, and had not diligently prosecuted the work which could reasonably be expected to result in such production, its rights ceased and determined.

But how about the plaintiff's contention that the lessors by their conduct in effect extended this lease beyond the specified term mentioned, at least for a sufficient time for it to drill in the well which was in process of being drilled at the time this suit was brought? It is shown that in the early part of December the lessors informed the lessee that if it desired it might abandon the well then being pumped and proceed to drill another well, and if it was not completed within the term of one year from the making of the lease, they would take no advantage of that fact, but would permit the well to be completed. The defendant J. F. Greenleaf says that he coupled this with the statement that the plaintiff should proceed diligently to do this. It is further shown that J. F. Greenleaf, one of the lessors, was occupying the residence upon the premises, and that this residence was being furnished with gas from the well then on the land, and that at the time this well was being abandoned he required this supply of gas to be furnished by the plaintiff from another source. This was done after the expiration of the one year. It is contended that his acts in this regard were the acts of all of the lessors, for the reason that he was the party in possession. He was receiving this part of the consideration for the lease, and continued to receive it after the expiration of the term, wherefore it is contended that having advised the plaintiff that it might abandon that well and drill another, and no advantage would be taken of it should it fail to get it completed within the year, and having, after the expiration of the year, accepted benefits under the lease, lessors cannot now say that this conduct did not amount to an extension of the lease for such a time as would enable the plaintiff to complete the second well. It has been held repeatedly that where the continuance of a lease such as this depends upon the payment of money by a

certain time, any conduct upon the part of the lessor which would indicate that the time of payment might be extended, or conduct on his part indulging the lessee in making such payment, would estop him from claiming that the lessee's rights had ceased. *Hukill* v. *Myers,* 36 W. Va. 639; *Pyle* v. *Henderson,* 65 W. Va. 39; *Monarch Gas Co.* v. *Roy,* 81 W. Va. 723. And the general principle that one cannot claim a forfeiture where he has so conducted himself as to lead the other party to the contract to the belief that such a claim would not be made, is discussed in the cases of *Railroad Co.* v. *Town of Triadelphia,* 58 W. Va. 487, and *Pheasant* v. *Hanna,* 63 W. Va. 613. It may be argued that the lessee in this case did not proceed diligently to drill this second well, but when we recall that this was in mid-winter, and that it directed the location of the second well within a little more than a month after this invitation by the lessors, and proceeded to drill it within a very short time thereafter, in view of the fact that the conduct of the lessors indicated that what they were after was a productive well, we cannot say that the plaintiff did not act with reasonable rapidity under the circumstances. If instead of advising the plaintiff that it might abandon the well then being used and go on and drill a second well without regard to whether it was completed within the time mentioned in the contract, the lessors had insisted early in December upon the letter of their contract, it is reasonable to suppose that the plaintiff would have exerted more strenuous efforts to complete a well producing oil in paying quantities within the specified term mentioned in the lease. And then the conduct of the lessors in accepting the gas which was contracted to be furnished by the lease beyond the specified term therein mentioned is strong evidence that at that time at least, which was the 6th of February, they had no idea of claiming that the plaintiff did not have a right to drill the second well which it was then making preparations to drill. These preparations went forward rapidly, one of the lessors assisting in making them, and not until they were completed, and the work of drilling the well actually begun, did the lessors raise any question of the plaintiff's right. We are constrained to hold that

their conduct in this case was such as to justify the plaintiff in believing that it had the permission of the lessors to drill this second well, even though it went beyond the fixed term mentioned in the lease in doing so. It may be urged that the lessees in the second lease would be prejudiced by this holding, but when we consider that they had full knowledge that the plaintiff was upon the ground at the time they took their lease, and was at that time actually drilling the second well, it is clear that there is no merit in this contention.

We find no error in the decree complained of and will affirm the same.

*Affirmed.*