426 S.E.2d 522

Edward F.L. BRUEN, Lorna Harrah Bruen, and Nicholas Livingston Bruen, as Co–Executors of the Estate of Alexander Jay Bruen, Jr.; Edward F.L. Bruen; Constance Bruen Barrow; Evelyn Bruen Trevor; and Dora D.B. Ide and Citibank, N.A., a National Banking Institution, as Trustees Under the Will of John Jay Ide, Plaintiffs Below, Appellees,

v.

COLUMBIA GAS TRANSMISSION CORPORATION, a Delaware Corporation, Successor to United Fuel Gas Company; C.L. Glover, Brenton Y. Glover, C.L. Glover, Jr., Brenda J. Glover, W.L. Glover and Dorothy Glover, Trading and Doing Business as Glover Gas Company; Harry A. Holtam; and Mountain Gas, Ltd., Defendants Below,

Columbia Gas Transmission Corporation, a Delaware Corporation, Successor to United Fuel Gas Company, Defendant Below, Appellant.

No. 20734.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1992.

Decided Dec. 16, 1992.

Thomas R. Goodwin, Goodwin & Goodwin, Charleston, for appellant.

Charles W. Yeager, Steptoe & Johnson, Charleston, Donald R. Johnson, Bristol, for appellees.

McHUGH, Chief Justice:

This case is before the Court upon the appeal of Columbia Gas Transmission Cor-

poration, the defendant below, from the May 9, 1991 order of the Circuit Court of Kanawha County, which upheld a jury verdict against the appellant. The appellees and plaintiffs below are: Edward F.L. Bruen, Lorna Harrah Bruen, and Nicholas Livingston Bruen, as co-executors of the estate of Alexander Jay Bruen, Jr.; Edward F.L. Bruen, Constance Bruen Barrow and Evelyn Bruen Trevor, and Dora D.B. Ide, and Citibank, N.A., as trustees under the will of John Jay Ide.

## I

At issue in this case is an oil and gas lease entered into by the parties' predecessors-in-interest on January 31, 1907. The lease granted to the appellant's predecessor-in-interest, namely, United Fuel, the oil and gas rights in certain property located in Kanawha and Jackson counties.

The lease provided for payment to the appellees (the lessors, the Bruens) a ⅛ royalty on all oil produced, and annual rent of $200 for each gas well "from the time and while the gas is marketed[.]" The lease further provided for minimum rental of $1200 per year payable in advance, with all rental and royalty payments to be deducted from the $1200 minimum annual rental.

Most importantly, for purposes of the primary issue in this appeal, the lease provided that it would be "for the term of ten years (and so long thereafter as oil or gas is *produced* from the land leased and royalty and rentals paid by lessee therefor)[.]" (emphasis supplied)

Although the appellant timely tendered payment of the $1200 minimum annual rental from 1907 until trial, apparently there was a dissatisfaction on the part of the Bruens as early as 1916. For example, in 1916, as the original ten-year term approached expiration, Alexander Bruen

threatened to terminate the lease; following the several complaints by the Bruens, the appellant would essentially explain the status of oil and gas production at the wells, and point out that the type of lease that was involved only required a minimum annual rental payment of $1200.[1]

The appellees point out that from 1926 to 1936, only one well was the source of production, and it was not producing in paying quantities—never during that period did it produce enough to exceed the minimum rental payment of $1200. From 1907 to 1937 and from 1944 to the time of trial, the Bruens received only the $1200 minimum annual rental payment.[2] In other words, the only period in which the Bruens received any royalties which exceeded the minimum annual rental payment was from 1937 to 1944.

In 1980, the Bruens filed an action in federal court challenging the validity of the lease. That action was dismissed for lack of diversity. In 1983, a second federal action was filed, as well as this state action, alleging that the lease terminated sometime between 1962 and 1971. In 1990, the Bruens, over the appellant's objection, amended their complaint to allege that the lease terminated sometime between *1928 and 1971* due to the appellant's alleged failure to produce oil or gas in paying quantities.

The appellant denied liability, asserting that: (1) the Bruens' claims were barred by the statute of limitations, laches, and estoppel; and (2) the continuous $1200 minimum annual rental payments continued the lease through the date of the amended complaint.

The action was tried in the circuit court from April 15, 1991 to May 1, 1991. There was expert testimony at trial for the Bruens that in 1926, the present value of

---

**1.** Over the years, the following transpired:

In 1933, as part of an investigation by counsel for the Bruens, the appellant responded that no oil and very little gas had been produced. The appellant also noted the fixed rental rate.

In 1941, the Bruens ceased cashing the $1200 rental payment checks.

In 1954, the Bruens, through counsel, again indicated their dissatisfaction with the lease.

In 1956, by agreement between the parties, the Bruens could again cash the rental checks *without prejudice to their rights and remedies under the lease.*

In 1968, the Bruens again ceased cashing the rental payment checks.

**2.** The smallest production occurred in 1933.

the gas removed was $36,273,162; rents and royalties were $1,485,314; and the cost of production was $5,672,568.[3]

At the conclusion of evidence, the circuit court ruled that as a matter of law, the Bruens did not know, and with reasonable diligence, could not have discovered information concerning the alleged termination of the lease until after they filed the 1980 federal action.

Although the trial of this case transpired over a two-week period, thus, producing a voluminous record, basically, the theory of the appellees' case was that the lease at issue terminated sometime between 1928 and 1971. Accordingly, the critical jury instruction offered on behalf of the appellee concerned the liability, if any, on the appellant's part from that period to date.

The jury returned a verdict in favor of the Bruens, finding that: (1) the lease terminated in 1933 for failure to produce in paying quantities; and (2) neither the appellant nor its predecessor-in-interest knew or should have known that the lease had terminated, and therefore, the appellant was a "good faith trespasser." Accordingly, the jury awarded the Bruens damages in the amount of $29,584,693.00.

In this appeal, the appellant primarily contends that the circuit court committed reversible error in instructing the jury on the appellant's liability.

## II

The circuit court in this case, over the appellant's objection, instructed the jury that the word "produced" in an oil and gas lease means "produced in paying quantities."[4] The appellant contends, as it did before the circuit court, that this instruction is a misstatement of law, because, in the case of *flat-rate* leases, such as the one

3. Accordingly, as per the expert testimony, the Bruens incurred a net loss of $29,115,280, or $36,273,162 less rents and royalties of $1,485,-314 and production costs of $5,672,568.

Although the amended complaint alleged that the lease terminated as early as *1928*, the Bruens' evidence, introduced by expert testimony, went back to 1926.

4. The instruction, in its entirety, provides:

in this case, quantity of production is irrelevant. We agree with the appellant's contention.

With respect to the "flat-rate" involved in this case, the lease specifically provides: "Lessee agrees to pay Lessor Twelve Hundred Dollars ($1200.00) per year net rental until the royalties and rentals reserved in this lease exceed that amount unless lease be surrendered before said time as above provided."

Because the lessors are assured, under the terms of the lease, $1200 per year, this type of oil and gas lease is designated as a "flat-rate" lease.

The appellant points to the distinction between "flat-rate" leases and "production" leases, claiming that because the lease in this case is flat-rate, then, a line of cases holding that production is irrelevant would be applicable.

The line of cases to which the appellant refers is well established. In *McGraw Oil Co. v. Kennedy*, 65 W.Va. 595, 64 S.E. 1027 (1909), this Court spoke to the nature of a flat-rate lease for oil and gas:

This lease *does not limit its term by requiring that oil or gas shall be found in paying quantity*, as leases usually do. It says that the lease shall endure 'five years from this date and as long thereafter as oil and gas, or either of them, is produced therefrom by the party of the second part.' So, this lease contains nothing in terms allowing the lessor to end it because oil or gas is not found in paying quantity.

65 W.Va. at 598, 64 S.E. at 1028 (emphasis supplied); *see also* syl. pt. 1, *id.*

Similarly, in *Bassell v. West Virginia Central Gas Co.*, 86 W.Va. 198, 103 S.E. 116 (1920), the Court again addressed a lease involving an annual rental per well.

The Court instructs the jury that the lease in question was for a period of ten (10) years beginning in 1907, and for 'so long thereafter as oil or gas is produced from the land leased and royalty and rentals paid by lessee therefor' and that, under law, the word 'produced' in an oil or gas lease means 'produced in paying quantities.'

*The rental bears no relation to the quantity of gas contemplated or actually produced.* It was compensation fixed in advance of production and without any definite knowledge as to what the production would be. Hence, *the rental reserved was the same for wells of light production and wells of heavy production.*

86 W.Va. at 202, 103 S.E. at 117 (emphasis supplied).

In *McCutcheon v. Enon Oil & Gas Co.,* 102 W.Va. 345, 135 S.E. 238 (1926), the Court said of flat-rate oil and gas leases:

[T]he lease *does not in terms say the well must produce gas in 'paying quantities'* and be marketed. Having no market, the lessee had the right to shut the gas in and pay the stipulated price. It would be of little concern to lessor what was done with the gas, if he gets his payments.

102 W.Va. at 354, 135 S.E. at 241 (emphasis supplied). And in *Ketchum v. Chartiers Oil Co.,* 121 W.Va. 503, 506, 5 S.E.2d 414, 416 (1939), the Court distinguished a flat-rate lease from the "usual" lease: "Unlike the usual oil and gas lease, production of oil and gas in *paying quantities* is not expressly required for the extension of the instant lease beyond the fixed term." (emphasis in original)

A more recent recognition of the distinction between flat-rate leases and production leases by this Court was in *Goodwin v. Wright,* 163 W.Va. 264, 255 S.E.2d 924 (1979). In *Goodwin,* we held in that opinion's first syllabus point, that "[t]he term 'production,' when used in a mineral lease as the basis for continuation of the lease in force, means production in paying quantities." In that opinion's second syllabus point, we held:

When a well is not producing in paying quantities and no royalties or rentals are being received by the lessors, these being required by the terms of a lease as necessary to its continuation, receipt by lessors of free gas for domestic purposes from the well does not constitute consideration sufficient to keep lessors bound

by the lease, nor does it amount to 'production.'

In the case now before us, however, production in paying quantities is not what is "required by the terms of [the] lease as necessary to its continuation," as set forth above. Rather, the type of lease involved in this case requires "flat" payments of rental in the amount of $1200 per year, *regardless* of production.

The lease at issue in *Goodwin* was not a flat-rate lease, and the Court indeed recognized this:

We are cited to *McGraw Oil & Gas Co. v. Kennedy,* 65 W.Va. 595, 64 S.E. 1027 (1909). A well was drilled and capped, and the producer paid lessor the amount of rental payments *as if he had sold the gas.* When subsequent leases from the property owner attempted to void the lease which was the authority for the drilling, we held that the lessee, paying $200 per year as the lease called for, as rental on 'each gas well the product from which is marketed and used off the premises,' could hold the lease even if he capped the well. Lessor's position was intact. Obviously the decision is not useful here, however.

We decided that a lease had not expired by its terms, even though production was not in paying quantities, in *McCutcheon v. Enon Oil & Gas Co.,* 102 W.Va. 345, 135 S.E. 238 (1926). [The suit was to cancel an oil and gas lease that was for 10 years and as long thereafter as oil or gas, or either of them, was produced.] There was a royalty for gas of $75 quarterly for each well from which gas was marketed and used off the premises. There was also a free gas clause and if a well was not completed within one year, a delay rental payment of $131.25 quarterly.

We found no expiration even though gas was 'shut in' and both lessor and lessee were aware of this when they agreed to the lease.

Lessor treated it as a producing well. He used gas from it. Its production capacity was gauged at 1,500,000 feet per day; however, the lease does not in

terms say the well must produce gas in 'paying quantities and be marketed. Having no market, the lessee had the right to shut the gas in and pay the stipulated price. It would be of little concern to lessor what was done with the gas, if he gets his payments.['] [135 S.E. at 241]

Both cases upheld leases when there was no paying production, but both lessors received rental payments as though there was paying production, and in the same amount.

163 W.Va. at 267 n. 3, 255 S.E.2d at 926 n. 3 (emphasis in original).[5]

The appellees, on the other hand, contend that the distinction between the types of leases is inapposite. Rather, the critical focus should be on the good faith of the lessee to produce in paying quantities. *See South Penn Oil Co. v. Snodgrass,* 71 W.Va. 438, 451–52, 76 S.E. 961, 967 (1912) ("The tests of duty and right are diligence and good faith in almost all cases when the terms, read in the light of the conditions and circumstances, will permit their observance.") Furthermore, the appellees maintain that the cases relied on by the appellant involve situations where there was no market for the product.

Although the lack of a market factor may have been present in some of those cases, based upon this Court's interpretation of the opinions in that line of cases, there is no indication that a lack of market is the dispositive factor. Furthermore, it has been noted by a leading scholar on this state's oil and gas law, in speaking of the

---

**5.** The appellant also contends that there is legislative recognition in flat-rate types of leases, and implicit therein, no regard to *production.* For example, *W.Va.Code,* 22B–1–8 [1985] provides, in part:

(a) The Legislature hereby finds and declares:

(1) That a significant portion of the oil and gas underlying this state is subject to development pursuant to leases or other continuing contractual agreements wherein the owners of such oil and gas are paid upon a royalty or rental basis *known in the industry as the annual flat well royalty basis, in which the royalty is based solely on the existence of a producing well, and thus is not inherently related to the volume of the oil and gas produced or marketed;*

. . . .

(3) *That a great portion, if not all, of such leases or other continuing contracts based upon or calling for an annual flat well royalty, have been in existence for a great many years* and were entered into at a time when the techniques by which oil and gas are currently extracted, produced or marketed, were not known or contemplated by the parties, nor was it contemplated by the parties that oil and gas would be recovered or extracted or produced or marketed from the depths and horizons currently being developed by the well operators[.]

. . . .

(b) In the light of the foregoing findings, the legislature hereby declares that it is the policy of this state, to the extent possible, to prevent the extraction, production or marketing of oil or gas under a lease or leases or other continuing contract or contracts providing *a flat well royalty or any similar provisions* for compensation to the owner of the oil and gas in place, *which is not inherently related to the volume of oil or gas produced or marketed,* and toward these ends, the legislature further declares that it is the obligation of this state to prohibit the issuance of any permit required by it for the development of oil or gas where the right to develop, extract, produce or market the same is based upon such leases or other continuing contractual agreements.

(emphasis supplied) Similarly, *W.Va.Code,* 36–4–9a [1979] provides, in part:

There shall be a rebuttable legal presumption that the failure of a person, firm, corporation, partnership or association to produce and sell or produce and use for its own purpose for a period of greater than twenty-four months, subsequent to the first day of July, one thousand nine hundred seventy-nine, oil and/or gas produced from such leased premises constitutes an intention to abandon any oil and/or gas well and oil and/or gas well equipment situate on said leased premises, including casing, rods, tubing, pumps, motors, lines, tanks, separators, and any other equipment used in the production of any oil and/or gas from any well or wells on said leasehold estate.

This rebuttable presumption shall *not* be created in instances (i) of leases for gas storage purposes, or (ii) where any shut-in royalty, *flat rate well rental,* delay rental, or other similar payment designed to keep an oil or gas lease in effect or to extend its term has been paid or tendered, or (iii) where the failure to produce and sell is the direct result of the interference or action of the owner of such oil and/or gas or his subsequent lessee or assignee.

(emphasis supplied) Perhaps these statutes reflect a legislative intent to recognize the characteristics of a flat-rate oil and gas lease. However, they are not necessarily dispositive, inasmuch as they are not at issue in this case.

above-quoted cases and their relation to the market:

> It may be noted that [*McCutcheon*] is in accordance with the theory announced in the *McGraw* case, in which the marketing provision was construed as a condition for the benefit of the lessee which he might waive. This view seems to be the correct one, if the question is approached from the standpoint of the law of contracts. However, it must be remembered that irrespective of which party has the power to waive the condition, it is still a condition not alone qualifying a promise, but from the viewpoint of the law of real property, also limiting the duration of a vested estate. The estate ends if neither the well rental is paid nor the gas marketed, quite as effectively as a determinable fee ends when the land ceases to be used for a specified purpose.... Moreover, the *McGraw* and the *McCutcheon* cases both purport to limit the rule to situations where there is no available market for the gas. But if, as said in the latter case, it is of no concern to the lessor so long as he receives his payments, by parity of reasoning it would seem that the lessee by tendering the rental might *arbitrarily* shut in the well even though a market is available (perhaps holding for higher prices). *No decision on this point has been made.*

Robert Tucker Donley, *The Law of Coal, Oil & Gas in West Virginia and Virginia* § 70, at 88–89 (1951) (emphasis supplied).

The appellees also rely heavily on a case that they assert the circuit court used as a "guide" in instructing the jury. In *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 690 (1959), the Supreme Court of Texas held that "the terms 'produced' and 'produced in paying quantities' mean substantially the same thing." *See Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509 (1942). The circuit court did, in fact, follow this holding in its instruction to the jury.[6]

The Texas *Clifton* case, however, is clearly contrary to the long line of authority that has been established in this jurisdiction and set forth herein, specifically, that where a flat-rate lease is involved, quantity of production is irrelevant to the continuation of the lease. Moreover, *Clifton* is not controlling in this jurisdiction. Consequently, it was erroneous for the circuit court to rely on that case in instructing the jury on the question of liability. Giving this instruction clearly constitutes reversible error because it went to the heart of the case in establishing liability on the part of the appellant.

▮ Accordingly, we hold that if an oil and gas lease contains a clause to continue the lease for a term "so long thereafter as oil or gas is produced," but also provides for "flat-rate" rental payments, then quantity of production is not relevant to the expiration of the term of the lease if such "flat-rate" rental payments have been made by the lessee. Therefore, in a case involving termination of such an oil and gas lease which provides "flat-rate" rental payments, it is reversible error for a circuit court to instruct the jury that the word "produced" in the lease means "produced in paying quantities."

---

**6.** Related to the erroneous instruction in this case are the following instructions, given over the objection of the appellant:

> The Court instructs the jury that 'paying quantities' means the quantity of gas sufficient to pay a profit over production expenses. The term 'production expenses' means those expenses incurred by a reasonable and prudent operator in the actual production and maintenance of the well and the expenses necessary for the lessee to comply with the lease, including taxes and rentals to be paid by the lessee under the terms of the lease.
>
> The Court instructs the jury that the lessee, United Fuel Gas Company, predecessor to Columbia Gas Transmission Corporation, in order to possess the lease beyond the initial or primary term of ten (10) years, must have been producing gas from a well or wells in paying quantities. If you find from a preponderance of the evidence that the well or wells on the lease premises failed to produce in paying quantities after the initial or primary term of ten (10) years, then you must find that the lease terminated at the time when failure to produce in paying quantities occurred.
>
> We make no decision in this opinion as to whether these instructions are proper in *any* case involving an oil and gas lease. It is sufficient to note that they are not relevant to the type of lease in *this* case, because it is a flat-rate type of lease.

Inasmuch as the parties do not dispute that the $1200 minimum annual rental payments were made, there is no liability on the appellant's part and the judgment of the circuit court is reversed on this issue.

### III

The other issues raised by the appellant concern damages, interest, and the statute of limitations. However, in light of our decision in this case that there is no liability on the appellant's part, these issues need not be addressed.

### IV

Based upon the foregoing, the May 9, 1991 order of the Circuit Court of Kanawha County is reversed.

Reversed.