**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1533**

MARTHA WELLMAN; CHARLES WELLMAN,

     Plaintiffs - Appellants,

  v.

BOBCAT OIL & GAS, INC.,

     Defendant – Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.   Robert C. Chambers, Chief District Judge.  (3:10-cv-00147)

Argued:  March 19, 2013     Decided:  May 7, 2013

Before DUNCAN, FLOYD, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Jason Andrew Poling, Robert R. Waters, WATERS LAW GROUP, Huntington, West Virginia, for Appellants.  Matthew James Perry, LAMP, ODELL, BARTRAM, LEVY, TRAUTWEIN & PERRY, PLLC, Huntington, West Virginia, for Appellee.  **ON BRIEF**: Julie A. Warren, LAMP, ODELL, BARTRAM, LEVY, TRAUTWEIN & PERRY, PLLC, Huntington, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Charles and Martha Wellman ("Appellants" or the "Wellmans") appeal an order by the district court declining to invalidate an oil and gas lease granted to Bobcat Oil & Gas, Inc. ("Appellee" or "Bobcat"). The district court concluded that the lease did not terminate for lack of natural gas production or due to missed or late rental payments. On appeal, Appellants contend that the lease automatically terminated because Bobcat failed to produce natural gas in paying quantities and further failed to tender timely rental payments, both of which they claim are required by the lease. They assert that even though the lease provides for the payment of a "flat-rate" rental, rather than a "production-based" royalty, the lease nonetheless requires production, and, that, therefore, Bobcat's alleged failure to satisfy this condition terminated the lease. We disagree.

Under longstanding West Virginia law, the quantity of production is irrelevant to the expiration of the secondary term of a mineral lease that provides for "flat-rate" rental payments. Moreover, the Wellmans' claim that Bobcat forfeited the lease by failing to tender certain rental payments fails on the grounds of ratification and principles of equity. For the reasons detailed below, we affirm.

2

I.

A.

On May 17, 1933, Ida May Dean Purdue ("Purdue") executed a lease with the Chartiers Oil Company ("Chartiers"), in which Chartiers was given the right to extract oil and gas from the mineral estate owned by Purdue, located on Gragston Creek in Wayne County, West Virginia (the "Lease").

The "habendum," or term, clause of the Lease provides:

> It is agreed that this lease shall remain in full force for the term of ten years from this date and as long thereafter as oil or gas, or either of them, is produced from the said land by the said party of the second part, its successors and assigns.

J.A. 44.[1]  The Lease requires the lessee to pay to the lessors a flat-rate rental of "$75 each three months in advance for the gas from each and every well drilled on said premises . . . to be paid each three months thereafter while the gas from said well is marketed and used."  Id.[2]

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] In contrast, the Lease provides for a 1/8th royalty on all oil produced.

We observe that mineral leases providing for the payment of a flat-rate rental instead of a production-based royalty have been disfavored in West Virginia as a matter of public policy since 1982.  See W. Va. Code § 22-6-8(a)(4), (b).  Even so, the Wellmans do not argue that the Lease is invalid for this reason. See Wellman v. Bobcat Oil & Gas, Inc., CIV.A. 3:10-0147, 2011 WL 6415487, at *2, 5 (S.D.W. Va. Dec. 21, 2011) (noting that "the (Continued)

3

On January 12, 1978, the Wellmans purchased the rights as the lessor to the mineral estate from Purdue.  Chartiers sold its rights under the Lease to PIP Petroleum ("PIP"), who in turn sold the rights to Bobcat on March 10, 1993.  On March 31, 1993, PIP notified the Appellants that it had sold its interest in the mineral estate to Bobcat, and that beginning in January of 1994, "all Flat Royalty payments will be made by Bobcat Oil & Gas Company."  J.A. 148.  On January 10, 1994, Bobcat began tendering the $75 flat-rate rental payments to the Wellmans on a quarterly basis, as PIP had done previously.

These requirements resulted in a total of 71 payments, to be made from Bobcat to the Wellmans, beginning in January 1994 to the third quarter of 2011, when the record in this case was closed.  Bobcat has presented proof indicating that all 71 payments were made, though the type of proof varies.  Of the 71 payments, 50 are evidenced by cancelled checks with Appellants' signatures.  The remaining 21 payments are demonstrated by check stubs, indicating the payment amount of $75 and the date upon which the checks were written.  Of the 21 check stubs, 17 checks are checks that the Wellmans admit they received beginning with

---

West Virginia legislature cannot overwrite pre-existing contracts, see, e.g., U.S. Const. art. 1, § 10").

4

the first quarter of 2008 until the close of the record, but elected not to cash. At issue in this case is the alleged non-payment of certain quarterly rental payments due before 2008, as well as allegedly late or missed payments due in 2008 and thereafter.

Regarding the allegedly late or missed payments due in 2008 and thereafter, Appellants stopped cashing the rental checks they received from Bobcat after the fourth quarter of 2007, and assert that certain rental payments owed after that time are either missing or late. According to both parties, the payment for the first quarter of 2008, which they agree for the sake of argument was due by January 29, 2008, was sent by certified mail on November 27, 2007. The parties disagree about all later payments.

The next check appears in Bobcat's check register for the date of March 27, 2008, as payment for the second quarter of 2008. The Wellmans claim that it was not sent until July 2008, when it was mailed by certified mail. Thus, the Wellmans contend that at least one quarterly payment is missing or late, and if it was late, all subsequent payments would be at least one quarter late. Bobcat responds that its check register indicates all rental payments have been tendered to the Wellmans. As noted, the record in the case was closed in the third quarter of 2011.

5

C.

The Wellmans commenced this action on February 12, 2010, and filed an amended complaint on July 26, 2010, which contains five counts: (1) breach of contract; (2) breach of common-law duties; (3) fraudulent concealment of mineral extraction; (4) declaratory judgment that the Lease is null and void because Appellee did not produce gas from the mineral estate on a consistent basis; and (5) negligent or intentional trespass. The Wellmans seek compensatory and punitive damages, an injunction against further gas extraction, an accounting of the mineral proceeds extracted, declaratory judgment that the Lease is null and void, and attorney's fees and costs.

On cross motions for summary judgment, the district court concluded that the Lease did not expire nor was it breached and granted judgment in favor of Bobcat. See Wellman v. Bobcat Oil & Gas, Inc., CIV.A. 3:10-0147, 2011 WL 6415487 (S.D. W. Va. Dec. 21, 2011) (concluding that production was irrelevant to continuation of Lease); Wellman v. Bobcat Oil & Gas, Inc., CIV.A. 3:10-0147, 2012 WL 484089 (S.D. W. Va. Feb. 14, 2012) (finding no dispute of material fact indicating defendant breached Lease through late or missing payments).

II.

We review de novo a district court's order granting summary judgment. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012).

III.

A.

We turn first to the Wellmans' contention that the Lease expired on its own terms because Bobcat ceased production of natural gas during certain identified periods. In this regard, they point to language in the term clause of the Lease that appears to require Bobcat to produce. Specifically, the Wellmans direct our attention to the language stating that the Lease continues "so long thereafter as oil or gas . . . is produced from the . . . land." J.A. 44. Bobcat responds that this case is squarely controlled by West Virginia law, which holds that a mineral lease providing for the payment of flat-rate rental payments rather than production royalties cannot terminate due to a lack of production. See Bruen v. Columbia Gas Transmission Corp., 188 W. Va. 730, 426 S.E.2d 522 (1992). We agree with Appellee. The case before us is squarely controlled by the Bruen decision and its antecedents.

The term clause in the Bruen lease extended the lease "so long thereafter as oil or gas is produced from the land leased and royalty and rentals paid by lessee therefore." Id.

7

at 552.  In terms of royalty, the lease required a 1/8 royalty on oil, a $200 annual rent for each gas well, and a $1200 yearly advance payment to the lessee, from which all royalties were subtracted.  Id.  As the district court correctly observed, the terms of the Bruen lease and the Lease in this case are essentially the same, excepting the $1200 annual payment.

In Bruen, the owners of the mineral estate sued the lessee, arguing that the mineral lease terminated because the well did not "produce" during various periods between 1928 and 1971.  Id. at 524-25.  The jury returned a verdict for the plaintiffs.  On appeal, the Supreme Court of Appeals of West Virginia concluded that the trial court erred in instructing the jury that "produced" means "produced in paying quantities," because the quantity of production regarding the disputed lease was immaterial.  Id. at 527.

The Bruen court first recognized the long-established distinction between "flat-rate" and "production" mineral leases, explaining:

> In McGraw Oil Co. v. Kennedy, 65 W. Va. 595, 64 S.E. 1027 (1909), this Court spoke to the nature of a flat-rate lease for oil and gas:
>
>> This lease does not limit its term by requiring that oil or gas shall be found in paying quantity, as leases usually do.  It says that the lease shall endure 'five years from this date and as long thereafter as oil and gas, or either of them, is produced therefrom by the party of the second part.'

8

> So, this lease contains nothing in terms
> allowing the lessor to end it because oil or
> gas is not found in paying quantity.

65 W. Va. at 598, 64 S.E. at 1028 (emphasis supplied); see also syl. pt. 1, id.

Similarly, in Bassell v. West Virginia Central Gas Co., 86 W. Va. 198, 103 S.E. 116 (1920), the Court again addressed a lease involving an annual rental per well.

> The rental bears no relation to the quantity of gas contemplated or actually produced. It was compensation fixed in advance of production and without any definite knowledge as to what the production would be. Hence, the rental reserved was the same for wells of light production and wells of heavy production.

86 W. Va. at 202, 103 S.E. at 117 (emphasis supplied).

In McCutcheon v. Enon Oil & Gas Co., 102 W. Va. 345, 135 S.E. 238 (1926), the Court said of flat-rate oil and gas leases:

> [T]he lease does not in terms say the well must produce gas in 'paying quantities' and be marketed. Having no market, the lessee had the right to shut the gas in and pay the stipulated price. It would be of little concern to [the] lessor what was done with the gas, if he gets his payments.

102 W. Va. at 354, 135 S.E. at 241 (emphasis supplied). And in Ketchum v. Chartiers Oil Co., 121 W. Va. 503, 506, 5 S.E.2d 414, 416 (1939), the Court distinguished a flat-rate lease from the "usual" lease: "Unlike the usual oil and gas lease, production of oil and gas in paying quantities is not expressly required for the extension of the instant lease beyond the fixed term." (emphasis in original).

Bruen, 426 S.E.2d at 524-25 (alteration supplied).

9

Addressing the lease before it, the <u>Bruen</u> court recognized,

> production in paying quantities is not what is "required by the terms of [the] lease <u>as necessary to its continuation</u>," . . . . Rather, the type of lease involved in this case requires "flat" payments of rental in the amount of $1200 per year, <u>regardless of production</u>.

<u>Id.</u> at 525 (emphasis supplied).

The <u>Bruen</u> court observed that its earlier decisions in <u>McGraw Oil</u> and <u>McCutchen</u> "upheld leases when there was <u>no paying production</u>, but both lessors received rental payments as though there was paying production, and in the same amount." <u>Id.</u> at 526 (emphasis added). In view of these principles, the <u>Bruen</u> court held:

> [I]f an oil and gas lease contains a clause to continue the lease for a term "so long thereafter as oil or gas is produced," <u>but also provides for "flat-rate" rental payments,</u> then quantity of production is not relevant to the expiration of the term of the lease if such "flat-rate" rental payments have been made by the lessee.

<u>Bruen</u>, 426 S.E.2d at 527 (emphasis supplied).

In this case, the term clause of the Lease provides as follows:

> It is agreed that this lease shall remain in full force for the term of ten years from this date and as long thereafter as oil or gas, or either of them, is produced from the said land by the said party of the second part, its successors and assigns.

10

J.A. 44. It may appear that this language, standing alone, requires production of oil or gas. But precisely like the lease in Bruen, the lease here "also provides for 'flat-rate' rental payments. . . ." Bruen, 426 S.E.2d at 527 (emphasis supplied). That is, the Lease requires the lessee to pay the lessors "$75 each three months in advance for the gas from each and every well drilled on said premises . . . to be paid each three months thereafter while the gas from said well is marketed and used." J.A. 44. Because the Lease provides for the payment of a flat-rate rental to the Wellmans, the quantity of production -- whether high, low, or zero -- is utterly irrelevant for determining whether the secondary term of the Lease expired, again assuming the payments are, in fact, made. See Bruen, 426 S.E.2d at 527; see also McCutcheon, 135 S.E. at 241 ("It would be of little concern to [the] lessor what was done with the gas, if he gets his payments."). Accordingly, we conclude that the district court did not err by determining that the quantity of production is irrelevant to the continuation of the Lease.

B.

Appellants also contend that Bobcat forfeited the Lease by failing to tender, or by tendering late, certain required rental payments. In support, they claim that certain rental payments were not made: one in 2003 and three in 2006.

11

Appellants also raise the argument that certain royalty payments were missing or late after the last quarter of 2007.

1.

Allegedly Missing or Late Payments Before 2008

As noted, the Lease provides for quarterly flat-rate payments of $75.00, paid "in advance," for natural gas produced from the leasehold estate. The parties agree that 71 total payments were due from the point at which Bobcat acquired the Lease to the close of the record in this case, that is, from January 1994 to the third quarter of 2011.[3]

The Wellmans now seek rescission based on late or missing checks from various points between 1995 and 2006, but they cashed many royalty checks during and after any such periods of delay. Indeed, the Wellmans concede they received and cashed the royalty payments for the four quarters of 2007 -- after earlier payments were alleged to be late or missing.

We agree with the district court that this acceptance negates any need to resolve the disputed issues of fact regarding the defects in earlier payments inasmuch as the Wellmans' acceptance of the 2007 payments ratified any breach

---

[3] The Wellmans believe that the payments are due on the 29th day of January, April, July, and October of each year, but Bobcat disputes that any specific payment schedule is required by the terms of the Lease.

12

that may have occurred before that time.  Under the doctrine of ratification, the district court correctly concluded that the Wellmans are prevented from now claiming that any defective payment due before 2008 voided the Lease.

In general, ratification occurs, and there is no breach justifying rescission, "so long as the injured party elects to treat the contract as continuing."  Atl. Bitulithic Co. v. Town of Edgewood, 137 S.E. 223, 225 (W. Va. 1927) (internal citations omitted).  Additionally, West Virginia law specifically prohibits a lessor from accepting imperfect performance under a lease on an ongoing basis, then complaining of the accepted breach.  See Ohio Fuel Oil Co. v. Greenleaf, 99 S.E. 274, 279-80 (W. Va. 1919) ("It has been held repeatedly that, where the continuance of a lease such as this depends upon the payment of money by a certain time, any conduct upon the part of the lessor which would indicate that the time of payment might be extended, or conduct on his part indulging the lessee in making such payment, would estop him from claiming that the lessee's rights had ceased.").

When the Wellmans accepted the quarterly payments throughout 2007, they ratified any defects in payments due before that time and may not now claim that such defects justify cancelling the Lease.  Thus, we are left with the question of

13

whether any post-2007 missing or late payments are sufficient to terminate the Lease.

                                    2.

          Allegedly Missing or Late Payments After 2007

          Appellants stopped cashing the rental checks they received from Bobcat after the fourth quarter of 2007.  They complain, however, that certain of these post-2007 payments were missing or late.  Because it is undisputed that the Wellmans decided not to cash any of these checks, the only evidence of their issue or timeliness is provided by Bobcat's check register, and, for some payments, certified mail records.  Appellants neither presented any records of the checks nor did they offer any evidence as to when they received the checks.

          As noted, Appellants assert that quarterly royalty payments are due on January, April, July, and October 29 of each year.  Although Bobcat disputes that the Lease requires any specific payment schedule, because both parties have used these dates to calculate the timeliness of the payments for the purpose of this case, we also use them for reference.[4]  Guided by these "due dates," the parties submitted charts indicating when

_____

    [4] We offer no opinion as to whether the Lease establishes these payment dates.

14

quarterly royalty checks for 2008-2012 have been due, written, and received.

We look first to the payments beginning with the payment due on January 29, 2008. The parties agree that this first quarter 2008 payment was due in January 29, 2008, and was sent on November 27, 2007, by certified mail. The parties disagree about all later payments.

The next check appears in Bobcat's check register for the date of March 27, 2008 ("second quarterly payment"), which it claims was both issued and mailed around that date. The Wellmans insist that they did not receive the second quarterly payment until sometime in July 2008, when it arrived by certified mail -- nearly one quarter late. Bobcat disputes this account, noting that its check register indicates that separate checks were issued in both March and July of 2008, for the second and third quarters of 2008. The Wellmans do not explain what they believe actually happened to the checks issued in March and July of 2008, but simply list the check issued March 27, the second quarterly payment, as corresponding to the July 2008 certified mailing. Based on these calculations, according to the Wellmans, the March 2008 and all subsequent quarterly payments are at least one quarter late. The district court concluded, however, that the Wellmans' version of events in this regard has little support in the record. See Wellman v. Bobcat

15

<u>Oil & Gas, Inc.</u>, CIV.A. 3:10-0147, 2012 WL 484089 (S.D. W. Va. Feb. 14, 2012).

We need not wade into this particular factual dispute because if we assume the second quarterly payment was either never issued or was late, the result would remain the same; neither circumstance is sufficient to justify cancellation of the Lease under West Virginia law. That is, for the sake of argument we can view the second quarterly payment as missed, in which case the third quarterly payment made in July 2008 and all subsequently payments were timely. Alternatively, we can view the second quarterly payment as simply tendered one quarter late, in which case all following payments were correspondingly one quarter late. Adopting either view of the facts, the single missed payment or correspondingly late quarterly payments are simply insufficient to justify cancelling the Lease and declaring Bobcat's leasehold estate forfeit.

The state supreme court has long expressed a "general disfavor of forfeitures in contractual matters[] within the context of oil and gas lease rental clauses. . . ." <u>Warner v. Haught, Inc.</u>, 329 S.E.2d 88, 95 (W. Va. 1985). The <u>Warner</u> court explained as follows:

> The failure to make stipulated quarterly payments on the well is not ground for declaration of a forfeiture of the lease, <u>in the absence of a clear and unequivocal stipulation that such failure to pay will forfeit.</u> We have many times declared, following the

16

rule formulated when chancery courts came into existence, that equity will never lend its aid to enforce a forfeiture. Never to declare or enforce a forfeiture, nor divest an estate or title for violation of a condition subsequent, is an invariable rule of equity, if there be a legal remedy. Under such circumstances, a court of equity utterly declines to touch the case, and leaves the party to his legal remedies. "Equity abhors a forfeiture."

Plaintiffs had their legal remedy for the enforcement of the quarterly payments, and in the answer defendant proffers to pay, upon an ascertainment of the amount, claiming that plaintiffs should account for the gas used from the well in one of the houses, which use was not authorized in the lease contract. The lease cannot be forfeited because of nonpayment of the quarterly payments, under the circumstances shown by the evidence.

Id. 329 S.E.2d at 95-96 (quoting McCutcheon, 135 S.E. at 241) (citations omitted and emphasis supplied). See also Bethlehem Steel Corp. v. Shonk Land Co., 288 S.E.2d 139, 142 (W. Va. 1982) ("The right to forfeit must be clearly stipulated for in terms, else it does not exist. Every breach of a covenant or condition does not confer it upon the injured party. It never does, unless it is so provided in the instrument. Such breaches are usually compensable in damages, and, if a forfeiture has not been stipulated for, it is presumed that the injured party intended to be content with such right as is conferred by the ordinary remedies." (citing Peerless Carbon Black Co. v. Gillespie, 105 S.E. 517 (W. Va. 1920))).

In this case, the Lease does not contain a "clear and unequivocal stipulation" that the lessee's failure to make

17

quarterly rental payments will result in forfeiture. <u>See</u> <u>Warner</u>, 329 S.E.2d at 95-96. Accordingly, even if we credited the Wellmans' allegations regarding the single missed payment or late payments that correspondingly followed, the evidence presented is far from sufficient to justify cancelling the Lease. <u>Id.</u> Therefore, under these facts, the Lease remains valid.

## IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.